THE PEOPLE *ex rel.* WILLIAM J. SCOTT, Attorney General of the State of Illinois, Plaintiff-Appellant, *v.* CONVENIENT FOOD MART, INC. *et al.,* Defendants-Appellees.

(No. 57117;

First District (3rd Division)—July 3, 1974.

William J. Scott, Attorney General, of Chicago (Robert S. Atkins, Peter J. Miller, and Robert A. Skirnick, Assistant Attorneys General, of counsel), for appellant.

Charles C. Kirshbaum, Winston & Strawn, and Barry L. Kroll, all of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

The Attorney General of the State of Illinois sought injunctive relief and civil penalties from three corporations and two individuals for alleged violations of the Illinois Antitrust Act. (Ill. Rev. Stat. 1969, ch. 38, par. 60—1 *et seq.*) The case was tried without a jury and after the State presented its evidence the defendants moved for judgment pursuant to section 64(5) of the Civil Practice Act. (Ill. Rev. Stat. 1971, ch. 110, par. 64(5).) The court sustained the motion, found the defendants not guilty and dismissed the complaint for want of equity. The State appealed.

The corporate defendants are Convenient Food Mart, Scot Lad Foods and Bresler Ice Cream Company. The individual defendants are William and Harry Bresler. Convenient is engaged in the business of operating, and granting franchises to others to operate, limited inventory grocery markets under the registered name of Convenient Food Mart. Scot Lad Foods owns fifty percent of the stock of Convenient, and its Meadowmoor dairy division sells milk and dairy products to Convenient's Illinois franchisees. The Bresler Company is engaged in the manufacture, distribution and marketing of ice cream and ice cream products and sells them to the same franchisees. William and Harry Bresler are officers of the Bresler Company and Convenient. They and other members of the Bresler family own the remaining fifty percent of Convenient's stock.

Bresler and Meadowmoor are Chicago based companies and their products have been sold for many years in small grocery stores throughout the Chicagoland area. In the middle 1950's an evolution took place

in the retailing of foods and the market for their products declined drastically. Chain stores expanded rapidly; the stores increased in numbers and size and large areas were set aside for automobile parking. Purchasing power enabled them to reduce prices, and the lower prices, the wide selection of merchandise and ease of parking attracted customers.

This aggressive competition was too much for many grocers. It was estimated that every time a supermarket opened, 10 or 12 small groceries closed. Those who supplied the groceries suffered too. The situation became acute for independent suppliers when the chain stores started to produce their own merchandise or develop close associations with large producers and distributors. Meadowmoor and Bresler were unable to obtain any of the chain business. Meadowmoor, which was also hurt when the practice of home milk delivery was widely discontinued, offered one-half ownership of the company to one of the grocery chains, but its offer was not accepted.

Faced with the gradual diminution of their business and its seemingly inevitable cessation, Bresler and Meadowmoor, unknown to each other, searched for possible remedies. Learning through a mutual friend of each other's problem and motivation, officers of the companies met, and after many discussions agreed to launch a combined attack on the difficulties besetting them. The officers conducted extensive research. They traveled to different states, observed what was being done by others, consulted with entrepreneurs of the grocery business, studied marketing techniques and experimented with various merchandising methods. From all this they developed—as a means of survival for themselves and the individual groceryman as well—a plan for making small groceries competitive with the supermarket chains.

Their concept was a number of family-owned stores that could profit from combined buying power and the lower operating costs resulting from the devotion and hard work of the family members. They designed a format of distinctive, attractively designed, clean, well-located food stores, with uniform equipment and fixtures, limited items of merchandise and ample parking space, which would give the public maximum service by staying open each day until midnight.

Bresler and Meadowmoor agreed to unite their forces and become franchisors for such stores. Their intent was to do everything possible to keep the small grocer in business by seeking from purveyors low prices and discounts, by arranging financing for fixtures and inventories, by guaranteeing leases, preparing advertising and furnishing skilled direction and expert advice. Convenient Food Mart was incorporated in 1958 and a pilot store was opened that year in Skokie, Illinois. The policy of careful supervision over its franchisees and obtaining every possible ad-

vantage for them was successful Convenient Food Mart stores have thrived and so has the corporation. Meadowmoor and Bresler have prospered. At the time the Attorney General's complaint was filed in 1971 there were more than 80 franchised stores in Illinois and, in addition, there were several stores owned and operated by Convenient itself.

In a four-count complaint the State charged the defendants with intending, by contract, combination or conspiracy, to fix, control and maintain the resale price of merchandise in accordance with the directives of Convenient; to compel the franchisees to buy Meadowmoor's milk and Bresler's ice cream in order to obtain Convenient franchises; to unreasonably restrain trade in the sale of milk, ice cream and other products to Convenient franchisees; to prevent the franchisees from buying milk and ice cream at prices lower than those of Meadowmoor and Bresler, and to permit the prices set in the stores operated by Convenient itself to control the prices of merchandise sold in franchised stores in the same market area, all in violation of sections 60—3(1)(a), 60—3(2), 60—3(4) of the Illinois Antitrust Act. (Ill. Rev. Stat. 1969, ch. 38, pars. 60—3(1)(a), 60—3(2), 60—3(4).) The complaint prayed that the franchise agreements and the contracts between Meadowmoor, Bresler and the franchisees be declared void, that Meadowmoor and Bresler be ordered to divest themselves of Convenient, that they be permanently enjoined from engaging in a similar business, and that each defendant be penalized $50,000 for the violation of each count in which it or he was named defendant.

Thus, a full circle has been turned in a decade and a half. In the late 1950's Meadowmoor and Bresler were struggling to withstand competition which was taking away the outlets for their products. In the early 1970's they and their offspring, Convenient, are accused of depriving competitors of outlets for their products.

The State's evidence was both documentary and oral. Among the documents introduced into evidence were franchise and security agreements between Convenient and certain franchisees, contracts between franchisees and the Meadowmoor and Bresler companies, and a manual for Convenient store operators. The franchise agreements required the franchisees to operate pursuant to the manual and provided that he shall "* * * purchase, sell and use such products as are required for the operation of the business, as designated by CFM [Convenient], and to be ordered exclusively from suppliers approved by CFM for quality." The agreements varied, however, and in some the words "for quality" were replaced by the words, "for volume purchasing and guaranteed sales benefits." Convenient issues from time to time a purveyors list which designates the suppliers it has approved. The franchise agreements also varied insofar as some provided that the franchisee agreed to "maintain

a uniform merchandising program as determined by CFM" and others stated that the franchisee agreed to maintain a "uniform price to be charged for its products as determined by CFM." In the security agreements the franchisees agreed to buy from Convenient, freezers, refrigerated cases, shelving and equipment for installation in their stores. The Meadowmoor-franchisee contract stated that the franchisee agreed to buy all his requirements of milk, cream and other dairy products exclusively from Meadowmoor for a term of 20 years; the Bresler-franchisee contract stated that the franchisee agreed to buy all his ice cream, mixes and frozen confections from Bresler for a term of 10½ years. The manual gave the franchisee detailed instructions about the operation of his store and his responsibilities to Convenient.

One franchisee testified that an officer of Convenient told him that he would be required to sign milk and ice cream contracts before he would be allowed a Convenient Food Mart franchise. Another testified that before he signed a contract with Convenient, he was told who the milk and ice cream purveyors would be. A third said he was told by Meadowmoor's president that if he did not stop selling a competitor's milk and put Meadowmoor's back in his store within 24 hours, his franchise would be taken away. A former national sales director of Convenient testified that a requirement for the consummation of a franchise was the signing of a milk contract with Meadowmoor and an ice cream contract with Bresler.

On the other hand, the State's witnesses gave testimony favorable to the defendants. Five franchisees were called as witnesses by the State. One testified that he did not always follow the prices suggested by Convenient; sometimes he charged more, sometimes he charged less. Another said he did the same thing. He also said that in some cases he bought merchandise from dealers not on the approved purveyors list. A third stated that he did not follow the suggested prices; he would charge more for some items and less for others. He also stated that he did not limit his purchases to the purveyors recommended by Convenient. The fourth testified that he bought from purveyors who served him best whether they were on the approved list or not, and that he set his selling prices as he wished. He said Convenient never defaulted him for either practice. The fifth testified that he set his own prices for the ice cream sold in his store.

Of the five franchisees, one testified that he was never tendered a Meadowmoor contract. He had a contract with Bresler, but said that even if he did not he would still buy his ice cream from Bresler. A second franchisee said he sold Meadowmoor milk, but had not been asked and had never signed a contract to do so. A third, who operated two stores,

testified he had not been asked to sign a contract to buy Meadowmoor milk for either store.

The documentary evidence also was not as one-sided as the State suggests. The franchise agreements provided that Convenient would not unreasonably withhold approval if the franchisee wished to buy and sell items not currently handled by the franchisor. The contracts with Meadowmoor provided that Meadowmoor's prices would be competitive with the general market price for comparable commodities. The manual stated that Convenient would recommend the maximum selling price for all merchandise, but that the franchisee at his discretion, could sell the merchandise below the recommended price.

At the conclusion of the State's case, the trial court sustained the defendants' motion for a finding in their favor. The principal issue in this appeal is whether that ruling was correct.

The State contends that the decision was error; that its evidence was sufficient to establish a prima facie case of restraint of trade, control of prices and illegal tying arrangements. The State points to the following as evidence of a conspiracy to restrain trade: (1) the formation of Convenient for the purpose of providing outlets for Meadowmoor and Bresler products, (2) the interrelationships and interlocking directorates between these companies and Convenient, and (3) forcing Convenient's franchisees to sign contracts to purchase ice cream from Bresler and milk from Meadowmoor as a condition to obtaining and retaining their franchises. It points to the provisions in the franchise agreements concerning Convenient's privilege to set the selling prices of the franchisees' merchandise as evidence that Convenient controlled prices. And it points to testimony that Convenient compelled the franchisees to buy Meadowmoor and Bresler products exclusively in exchange for the privilege of using the Convenient trademark and participating in the Convenient system, as proof that there was an illegal tying arrangement.

A major flaw in the State's position is the standard of proof it wishes to apply to its evidence. The first contention in its brief is that upon a motion by a defendant for dismissal at the close of a plaintiff's case, the evidence should be viewed in the light most favorable to the plaintiff. The State then concludes that if its uncontradicted evidence "sets up merely a prima facie case under the charges in the complaint, this court should reverse and remand this cause." We agree with the State that a prima facie case was made out if the evidence and the inferences from the evidence are viewed most favorably to the State, but we do not agree that we should reverse and remand because of it. In a non-jury trial, the court does not view the evidence in the light most favorable to the

plaintiff. Section 64(5) of the Civil Practice Act sets out the standard which governs a defendant's motion for a finding or judgment:

"In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding, judgment or decree in his favor. In ruling on the motion the court shall weigh the evidence." (Ill. Rev. Stat. 1971, ch. 110, par. 64(5).)

In arriving at its decision, we assume the trial court weighed the evidence—that which was favorable to the State as well as that which was unfavorable—evaluated the credibility of the witnesses and considered the relevant law. We must also examine the evidence and the law to determine whether the trial court erred in finding that the State failed to prove a prima facie case.

■■ The central policy of antitrust laws is against agreements which take away the freedom of purchasers to buy in the open market and to maintain, in the public interest, freedom of competition. (*Federal Trade Commission v. Brown Shoe Co.* (1966), 384 U.S. 316.) Some business practices have been found so restrictive of free trade that they are held to be per se violations of the antitrust laws. A per se violation is one where, to quote the State's brief, "certain arrangements, on their face, are so inherently anticompetitive and lacking in saving grace that they are best held illegal out-of-hand." A practice which has been found to be a per se violation and which has been dealt with strictly by the courts considering the problem is a "tying" agreement between sellers and buyers. A tying agreement is one where a buyer who is desirous of taking a single product from a seller agrees to take others in order to obtain the first or agrees that he will not buy that product from other suppliers. *Northern Pacific Ry. Co. v. United States* (1958), 356 U.S. 1.

■■■ The emphasis of the State's legal argument is on the tying arrangements between Convenient, Meadowmoor and Bresler and the franchisees. It asserts these arrangements constituted infractions of both sections 60—3(2) and 60—3(4) of the Antitrust Act. The lesser emphasis on the alleged violation of section 60—3(1)(a) is understandable. At best, it is only debatable whether the legislature intended subsection (1)(a) to apply to both horizontal and vertical price-fixing agreements. The Chicago Bar Association Committee on Antitrust Law states that it did not: "Section 3(1) does not reach vertical agreements, such as agreements between buyers and sellers fixing the price at which the buyer shall resell." (S.H.A., ch. 38, sec. 60—3, p. 842.) The language of the statute supports this interpretation. Subsection (1)(a) provides that it shall be unlawful for any person to engage in a combination or a conspiracy, or to make a contract with any person *who is,* or but for a prior agreement *would be, a competitor* of such person. The purpose of this

subsection is to prevent *competitors* from joining forces to fix prices. There is no evidence in the record that Convenient's franchisees compete either with each other or with those stores wholly owned by Convenient. To the contrary, State witnesses testified that a franchisee serves the area near his store. Franchisees might be in competition with each other if there were other Convenient stores in the immediate market area. There is, however, no evidence to that effect. Thus, even if 60—3(1)(a) were interpreted as embracing vertical price-fixing, proof that there was an infraction of this section was lacking. Furthermore, there was no conclusive evidence that prices were fixed; indeed, franchisees testified they set their own prices, and the Convenient manual explicitly stated that each franchisee could sell his goods below the prices Convenient might suggest. The State maintains that there was enough evidence to prove there was a program to enforce predetermined retail prices and that its documentary evidence was corroborated by testimony that the defendants threatened to put non-conforming franchisees out of business. Convenient's bark was worse than its bite. It may have threatened to terminate franchises if its suggestions were not followed, but it did nothing more. In the decisions reviewed by this court on this issue, the defendants found guilty of price-fixing had engaged in some form of coercive action, beyond the mere refusal to deal, which tended to force the purchasers of their products to adhere to a resale price program. (*Albrecht v. Herald Co.* (1968), 390 U.S. 145; *United States v. Parke, Davis & Co.* (1960), 362 U.S. 29; *Federal Trade Comm. v. Beech-Nut Co.* (1922), 257 U.S. 441.) We conclude that the judgment of the trial court on the issue of price-fixing was not contrary to the manifest weight of the evidence.

■■ In concentrating its fire on the tying agreements, the State takes the position that Convenient's trademark was the tying product and Meadowmoor's milk and Bresler's ice cream were the tied products. All tying arrangements are not necessarily per se violations of antitrust statutes. (*White Motor Co. v. United States* (1963), 372 U.S. 253.) The State concedes that a per se infraction based on tying arrangements cannot be established by a mere showing of a tie-in; that the additional elements of proof required are sufficient economic power in the tying product, and the restraint of a substantial amount of commerce in the tied product. (*Times-Picayune Publishing Co. v. United States* (1953), 345 U.S. 594.) The defendants' unlimited control over the Convenient trademark is said to demonstrate the requisite economic power, and the size of their sales to the franchisees is said to demonstrate a substantial restraint of commerce. The State's proof on the latter element consisted of an answer by Meadowmoor to an interrogatory that it sold annually about $2,000,000 worth of dairy products to Convenient franchisees, and

a stipulation by Bresler that it sold them $408,614 worth of ice cream products in the first 9 months of 1971.

There are two additional factors that enter into the present case: the significance of Convenient's trademark, the significance of its relationship, as a franchisor, with its franchisees, and the significance of the statutory admonition that in Illinois antitrust law enforcement is to be limited to unreasonable restraints of trade. (Chapter 38, section 60—3(2).)

■■ Sufficient economic power over the tying product is presumed if the tying product is controlled by a patent (*International Salt Co. v. United States* (1947), 332 U.S. 392) or by a copyright (*United States v. Loew's, Inc.* (1962), 371 U.S. 38), and there is growing authority that trademarks are presumptive of the power. *Siegal v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955 (1972); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.*, 463 F.2d 1002 (5th Cir. 1972), *cert. denied*, 409 U.S. 1086; *Falls Church Bratwursthaus, Inc. v. Bratwursthaus Management Corp.*, 354 F. Supp. 1237 (D. C. Virg. 1973).

While franchisors cannot violate antitrust laws any more than anyone else, franchisors are unique in that some control must be exercised over their franchisees in order to maintain the quality and standards of the franchise operation. In situations where identification with a franchisor's trademark is the basis of imposing restrictions on a franchisee, the imposition may be justified on the ground that the holder of the trademark must control the quality of the seller's goods or run the risk of giving up his rights in his mark. (Flinn, 40 Antitrust Journal, 149 (1971).) Indeed, the law compels him, at the risk of abandoning his right to the registered mark, to exercise control over his licensees in respect to the quality of his mark or service. *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 330 F.2d 667 (7th Cir. 1964); *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2nd Cir. 1959); *Morse-Starrett Products Co. v. Steccone*, 86 F. Supp. 796 (D.C. Cal. 1949); *E. I. DuPont DeNemours & Co. v. Celanese Corporation of America*, 167 F.2d 484 (C.C.P.A. 1948).

■■ Where circumstances justify it, Federal courts make use of what is commonly spoken of as the "rule of reason" to alleviate what otherwise might be a harsh result if the provisions of the Federal antitrust acts were literally enforced. Section 11 of the Illinois Act directs that when the language of the Act is the same or similar to that of the Federal antitrust acts (Sherman and Clayton Acts, Title 15 U.S.C.), the courts of this State shall follow the construction given to the Federal law by

the Federal courts. (Ill. Rev. Stat. 1971, ch. 38, par. 60—11.) Despite this statute, Illinois courts are not required to follow Federal decisions although they may do so if they find them persuasive. (*People v. Crawford Distributing Co.* (1973), 53 Ill.2d 332, 291 N.E.2d 648.) Federal courts have held, in applying the rule of reason, that tying arrangements may be justified if there is a valid business reason for them. The rule operates through the availability of an affirmative defense of justification. Franchisors may successfully defend otherwise proscribed tie-ins by demonstrating that the restraints imposed are the least restrictive means of protecting the good will associated with a trademark. (*Siegal v. Chicken Delight, Inc.*) An example is the case of *Susser v. Carvel Corp.*, 332 F.2d 505 (2d Cir. 1964) *cert. dismissed,* 381 U.S. 125 (1965).

The Carvel Company sold ice cream to some 400 franchisees who were required to purchase other products which were to be sold to the public from either Carvel or suppliers approved by Carvel. A number of former franchisees sued for damages alleging that the tying arrangements were a violation of the Sherman Act. In finding for Carvel, the district court said "no case has been found under any of the trust laws holding that the franchisor of a valuable trademark cannot restrict the line of business operated by his franchisee." (206 F. Supp. 636 (D.C.N.Y. 1962).) The court of appeals affirmed (332 F.2d 505 (2nd Cir. 1964)) and the Supreme Court dismissed certiorari (381 U.S. 125 (1965).)

The majority concurring opinion in the court of appeals pointed out that Carvel stores were uniform in the products offered for sale. The court stated that Carvel's requirement that only its products be sold at stores bearing its name derived from the desirability that the public identify each outlet as one of a chain which offered identical products at a uniform standard of quality. The court said that the tying item in the franchisor-franchisee relationship was the Carvel trademark and since the value of a trademark depended solely on the public image it conveyed, its holder must exercise controls to assure it that the mark is not shown in a derogatory light. The court went on to say:

> "The antitrust laws certainly do not require that the licensor of a trademark permit his licensees to associate with that trademark other products unrelated to those customarily sold under the mark. It is in the public interest that products sold under one particular trademark should be subject to the control of the trademark owner."

■■ Although similar in many ways, the Illinois Antitrust Act differs from the Sherman and Clayton Acts in that the general restraint section

—60—3(2)—directs that the rule of reason must be used in State anti-trust prosecutions. Section 60—3(2) states: "Every person shall be deemed to have committed a violation of this Act who shall  *  *  * unreasonably restrain trade or commerce." This positive directive of the Illinois statute avoids the presumption of irregularity found in the Federal cases, and instead places the burden upon the State to show in the first instance the anticompetitive effect of purported restraints. Thus, a question to be answered is whether based on the State's evidence the trial court could have found that the defendants were not unreasonable in their supervision of and dealings with Convenient's franchisees. We believe, considering the facts and circumstances disclosed by the record, the history and purposes of the Convenient plan, and the Illinois caveat that restraints to be unlawful must be unreasonable, that there was substantial justification for the court's conclusion that the tying requirements—if, indeed the court thought that the contracts as enforced rose to the level of tying agreements (*cf. Maywood Sportservice, Inc. v. Maywood Park Trot. Ass'n, Inc.* (1973), 14 Ill.App.3d 141, 302 N.E.2d 79), a question on which there was evidence favorable and unfavorable to both sides—were not unduly restrictive and that the defendants' arrangements with the franchisees were not unreasonable.

Convenient gave its franchisees its trademark and support. It gave them financing, advertising, experience, guidance and service. The monetary value of the Convenient trademark is shown by the price franchisees were willing to pay to be a member of the Convenient family. A franchise cost $67,000 and of this amount $17,485 had to be advanced in cash.

Convenient sought by its policies to generate and retain goodwill through the similarity of its stores, the consistent quality of its merchandise, competitive prices, uniform merchandising techniques and hours of operation. Its trail-blazing policy of accommodating customers by opening its stores 7 days a week and staying open until midnight has been copied by chain stores. An integral part of the original Convenient concept was for its stores to handle limited brands and limited items of merchandise which would be designated by Convenient and which were to be purchased from suppliers designated by Convenient. This has been the practice—one that works hand in hand with the space limitations of Convenient stores. Convenient stores are much smaller than supermarkets which have space to display full lines of merchandise and a wide choice of brands. Less space compels Convenient storekeepers to carry fewer brands and fewer items. There was no evidence that the brands and items recommended by Convenient were not commensurate with the market prices of similar merchandise. The Convenient concept would be frustrated and the franchisor's public image damaged if each storekeeper selected his own lines and brands; and the benefit of quant-

ity buying—shared in by all franchisees—would be destroyed if freedom of selection were permitted.

While Meadowmoor and Bresler obtained new outlets for their products by the formation of Convenient, they sold them to franchisees on a competitive basis, realizing, as one witness said, if the storeowners did not make money they could not survive and neither could Convenient. There was no proof that these products were inferior, overpriced or burdensome to the franchisees. The evidence was conflicting whether the products were forced on the franchisees. In this connection it is interesting to note that the defendant Scot Lad Foods, a purveyor of grocery items which could be sold by Convenient stores, made no effort to sell these items to the storeowners despite the fact that, through its subsidiary Meadowmoor, it owned half of Convenient.

The overall value of the Convenient trademark depended on its public recognition. Since it was the intention of Convenient to create an image in the public mind that each store was alike, we see little wrong in requiring each one to carry identical merchandise; since it was Convenient's desire to build a good reputation and to secure and maintain public acceptance, we see nothing wrong in its patrolling its system and enforcing its regulations. The testimony showed that Convenient's enforcement was more liberal than the franchise agreements and other documentary evidence indicated it could be. The controls it did enforce were reasonably compatible with legitimate economic purposes and were no more than appeared necessary to assure it and its progeny a secure place in the mercantile sun.

Meadowmoor and Bresler were charged in separate counts of the State's complaint with having violated section 60—3(4) of the Antitrust Act which prohibits agreements that substantially lessen competition or create a monopoly. The State's proof in reference to 60—3(4) was the same as that adduced in reference to section 60—3(2). Although section 60—3(4) does not repeat the restriction contained in section 60—3(2) that an antitrust violation only occurs when a person unreasonably restrains trade or commerce, it can be argued that the restriction, appearing as it does in the general restraint of trade section, carries over into section 60—3(4). Be that as it may, our legislature did not classify tying arrangements as per se violations as it did price-fixing agreements under section 60—3(1)(a) of the Act, and it was the State's burden to prove, if not the unreasonableness, at least the illegality of Meadowmoor's and Bresler's arrangements with the franchisees. One of the elements the State had to prove in order to establish that the milk and ice cream buying arrangements were unlawful was that a not insubstantial amount of commerce was affected by the arrangements. The State's case failed in this respect.

■■ The State brought out that Meadowmoor sold the franchisees about $2,000,000 a year in dairy products and Bresler $408,614 worth of ice cream products in nine months. The State offered no proof (only a possible inference which the State probably hoped the court would draw) that these sales substantially lessened competition in like products in the State or in the Chicagoland area. To the contrary, other evidence showed that Meadowmoor's sales to the franchisees was only .025 percent of its total Illinois sales. There was no proof as to what percentage Bresler's sales to the franchisees bore to its total sales. In *Tampa Electric Co. v. Nashville Coal Co.* (1961), 365 U.S. 320, the court in discussing a section 3 violation of the Clayton Act (which corresponds to section 60—3(4) of the Illinois Act) stated that, to determine substantiality, a court must weigh the probable effect of the agreement on the relevant area of effective competition. Explaining the necessity of such a consideration, the court delineated general areas of inquiry to aid in that determination. The court held it would be proper to inquire as to the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce within the relative market area, and the probable immediate and future effects which preemption of that share of the market might have on effective competition therein. The court specifically held that, "* * * a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence." Therefore, the showing of the dollar volume of business transacted between Meadowmoor and Bresler and Convenient franchises, without more, was insufficient to establish that the alleged tying arrangements substantially lessened competition or tended to create a monopoly in either milk or ice cream.

■■ When a defendant moves for judgment at the close of the plaintiff's case, the trial court is required to weigh all the evidence offered by the plaintiff. (Ill. Rev. Stat. 1971, ch. 110, par. 64(5); *M.F.M. Corporation v. Cullerton* (1973), 16 Ill.App.3d 681, 306 N.E.2d 505.) The motion is a procedural means of submitting the whole case to the court for a determination on the merits. (*Banks v. Gregory* (1959), 16 Ill.2d 227, 157 N.E.2d 12.) The court must decide whether the inferences and conclusions adduced by it from the evidence result in a prima facie case. (*McDonald v. Neale* (1962), 35 Ill.App.2d 140, 182 N.E.2d 366.) Unless the trial court could find that the State's evidence was so convincing and unequivocal as to enable it to draw inferences and reach the conclusions necessary to a finding that the antitrust statutes were violated, the defendants' motion for judgment was properly allowed. In reviewing the propriety of the ruling, it is the responsibility of this court to determine if the ruling was against the manifest weight of the evidence. *DeBello v.*

*Checker Taxi Co.* (1972), 8 Ill.App.3d 401, 290 N.E.2d 367; *Bilyeu v. Plant* (1966), 75 Ill.App.2d 109, 220 N.E.2d 513.

■■ There were many weaknesses in the State's evidence; some of its proof was contradictory and the testimony of its witnesses conflicting. There was ample evidence to support the trial court's decision. After reviewing the entire record we cannot say that the judgment of the court in respect to all four counts of the State's complaint was clearly erroneous.

The judgment is affirmed.

Affirmed.

McNAMARA, P. J., and McGLOON, J., concur.