RUBY RAY BLAKE, d/b/a S. Ray & Blake Realty Company, Plaintiff-Appellant, *v.* H-F GROUP MULTIPLE LISTING SERVICE *et al.*, Defendants-Appellees.

First District (1st Division) No. 60280

Opinion filed March 1, 1976.

Sidley & Austin, of Chicago (Thomas H. Morsch and Ronald V. Hirst, of counsel), for appellant.

Thomas J. McGrath, Ltd., of Homewood (Thomas J. McGrath and James A. Palmisano, of counsel), for appellees.

Mr. JUSTICE BURKE delivered the opinion of the court:

This is an action brought under the Illinois Antitrust Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—1 *et seq.*) wherein the plaintiff has alleged that the defendants have violated subsections 3(1) and 3(2) of the Act. (Ill. Rev. Stat. 1973, ch. 38, pars. 60—3(1), (2).) The circuit court of Cook County, in a bench trial, found for the defendants on all counts and denied the plaintiff's prayer for damages and injunctive relief. The plaintiff appeals contending that the trial court erred in finding that the defendants had not violated the Antitrust Act. The plaintiff contends that the defendants had unreasonably restrained trade by: (1) entering into an agreement not to deal with the plaintiff and other real estate brokers who were not members of the defendants' multiple listing service, and (2) refusing membership in their multiple listing service to the plaintiff and other real estate brokers based upon certain membership requirements which the defendant alleges are unreasonable.

The evidence at trial revolved around the H-F Group Multiple Listing Service in which the four defendant real estate companies were the only members. There is little disagreement concerning the facts in the case. Any disagreement relates to the inferences and legal conclusions one may draw from the facts. The H-F Group's real estate business was primarily conducted in the Homewood, Flossmoor and Olympia Fields area in the south suburbs of Cook County. The plaintiff, Ruby Ray Blake, was a licensed real estate broker who was unsuccessful in

her attempts to obtain the cooperation of the H-F Group in sharing commissions with her on sales made to clients she referred to them and in her efforts to gain membership in the group. The plaintiff contends that the defendants' concerted refusal to cooperate and their denial of membership to her and others constituted an unreasonable restraint of trade in violation of the Illinois Antitrust Act.

The H-F Group Multiple Listing Service was organized in March of 1969 by the four defendant real estate companies who remained through the time of trial the only members. The four defendant companies are: C. A. Baker Real Estate, F. C. Naughton & Company, Inc., E. M. Seay, and F. W. Prindiville & Company Real Estate. Each of these companies has its sole office in the Homewood-Flossmoor area and the four are the oldest real estate firms in the area. They primarily deal in the sale of residential properties in the Homewood-Flossmoor area.

The president or senior partner in each of the four defendant firms testified at trial concerning their reasons for organizing the H-F Group Multiple Listing Service and the operation of this service. Henry J. Bodnar, the President of both the H-F Group and his own firm, F. C. Naughton & Company, testified that prior to the formation of the H-F Group, the four member firms had "cooperated" with many other real estate firms. The term "cooperation" when used in the real estate business means that a real estate broker who has a client desiring to purchase a home may refer that client to another broker who has a home listed in which the client is interested. If the client then decides to purchase the home, the referring broker and the selling broker will "cooperate" by sharing the commission earned from that sale.

Mr. Bodnar testified that the four defendant firms had a number of problems when they were cooperating with other brokers. He complained of incidents where the brokers they referred clients to were often very unfamiliar with the homes they were selling and the community in which the homes were situated. He stated that this led to his clients being given inadequate service.

Ernest M. Seay, the President of the E. M. Seay firm, another defendant, testified that at the time the defendants formed the H-F Group Multiple Listing Service, there was another group already in existence, the South Suburban Multiple Listing Service. South Suburban, as the H-F Group, was a multiple listing service which is an organization of real estate brokers which shares with its members the listings of all real estate parcels for sale which the other members have. This type of organization is apparently quite common throughout the United States. When a home is listed for sale with a certain member broker, that broker will share the listing with all the members of the listing

service. If a sale is made by one of the members, then there is an arrangement provided for the sharing of the commission earned.

Mr. Seay testified that the South Suburban group covered a much wider area than the Homewood-Flossmoor area. The defendants had no interest in joining this group, Mr. Seay testified, because they did not feel they could properly serve persons selling homes in areas outside of the immediate Homewood-Flossmoor area. The defendants felt this way because they believed that to adequately serve their clients, all of their sales people should be personally familiar with both the home to be sold and its surrounding area. Because the defendants did not desire to join the South Suburban group, and because they felt they had to "meet the competition" of that group, the defendants formed their own multiple listing service, which was to be confined to the Homewood, Flossmoor and Olympia Fields area. Cornelius Baker and William Moore, who were partners in the other two defendant real estate firms, also testified that the H-F Group was formed to meet the competition of the South Suburban group.

In March of 1969, the four defendant real estate firms formed the H-F Group Multiple Listing Service. The charter of the H-F Group was set forth in an agreement signed by representatives of the four defendant firms. Paragraph 2 of the agreement provided that:

> "2. Each of the Realtors shall have the right to offer for sale, subject to the terms of this Agreement, any residential real estate on which any other Realtor has an exclusive listing. Such right shall not be given to other persons, firms or corporations who are not part of this Agreement."

In October of 1969 the agreement was amended to include certain membership requirements for new brokers who might apply for membership. These included that an initiation fee of $1000 be paid, a requirement that the applicant must not employ part-time salespersons, that the applicant not have more than one office, and that that office must be located in Homewood, Flossmoor or Olympia Fields. These membership requirements and the rule in paragraph 2 that members of the H-F Group may not cooperate with nonmember brokers are the basis of the plaintiff's case.

Mr. Bodnar, the H-F Group president, testified that the "sole office" rule was established because the defendant firms had had unsatisfactory experiences with multiple office firms showing people homes in their area in instances where the salesperson knew nothing about the home or the community. Bodnar also testified that the "no part-time salespersons" rule had been established because they had had many bad experiences with part-time sales people who lacked the motivation or

training to do a good job or who were out of the office just when they were needed.

The defendants testified that each had its sole office in the Homewood-Flossmoor area and employed only full-time real estate salespersons. They also testified that all of their sales people would tour every home they had listed for sale each Tuesday morning in what they termed the "Tuesday morning sales caravan." The defendant firms did almost all their business in Homewood, Flossmoor and Olympia Fields with occasional sales in nearby Hazel Crest, Glenwood and Chicago Heights. Great emphasis was put on each of the defendant's salespersons being fully informed about the homes they were selling and the surrounding community.

Ruby Ray Blake, the plaintiff, is a licensed real estate broker in Illinois and is the sole proprietor of the S. Ray & Blake Realty Company, which has an office in Harvey, Illinois, a suburb in southern Cook County. This office was opened in September 1967 and until several months prior to trial, the plaintiff had two to four sales people working in that office. At the time of trial, she only had a single part-time sales person working at her Harvey office.

The plaintiff had made most of her sales in the Harvey area, but she was interested in selling homes throughout the south suburban area, including the Homewood-Flossmoor area. She testified that the Homewood-Flossmoor area is about a 15- to 25-minute drive from her Harvey office, depending on the part of the area to which one would be driving. A cross-section of application forms of some of the plaintiff's clients seeking homes demonstrated that the plaintiff did have clients who were financially able to purchase homes in the Homewood-Flossmoor area. Homes in that area generally started at about $28,000, with most in the $40,000 plus range. The plaintiff testified that many of these clients were willing to purchase homes in the Homewood-Flossmoor area if they found the type home they were looking for there. She also testified, that while she had little personal knowledge of the Homewood-Flossmoor area, she had access to various publications which detailed what community resources were available there. From time to time she would advertise in newspapers which in part covered the Homewood-Flossmoor area. Plaintiff testified that she had sold a home in Flossmoor through a listing she had obtained from her membership in the South Suburban Multiple Listing Service.

The plaintiff's initial contact with the defendant multiple listing service, the H-F Group, was in May of 1970. The plaintiff contacted the E. M. Seay Company, a member of the H-F Group, about showing homes in the Homewood-Flossmoor area to a client of hers, a Bishop

Primm. The Seay Company did show several homes to the plaintiff's client, but a sale was never consummated. During this time the plaintiff contacted Mr. Bodnar, the President of the H-F Group, by telephone about cooperating by sharing commissions on sales made through clients she referred to the H-F Group. Mr. Bodnar testified that he explained to the plaintiff that the members of the H-F Group had a policy against sharing commissions with nonmember brokers. While the defendants showed a willingness to show homes to the plaintiff's clients, they never agreed to share commissions with her.

In September of 1970 the plaintiff sent a letter to the H-F Group indicating that she would like to join their multiple listing service. She received a reply which informed her that she was ineligible for membership because she did not have her office in Homewood, Flossmoor or Olympia Fields. Another request and a similar denial were exchanged several months later, this denial quoting the "sole office" provision of the H-F Group's by-laws. There was testimony that other brokers had also been excluded from membership in the H-F Group based upon the fact that they did not have their sole office in Homewood, Flossmoor or Olympia Fields.

In addition to the H-F Group, there were several other multiple listing services who had listings in the Homewood-Flossmoor area. The South Suburban Multiple Listing Service, mentioned previously, had been formed prior to the H-F Group and it covered a wide area in southern Cook County including the Homewood-Flossmoor area. The plaintiff testified that she joined South Suburban in about June of 1970 and had sold a home in Flossmoor through a listing she had obtained by virtue of her membership in the group. In September of 1970, a number of the large real estate firms terminated their membership in South Suburban. The plaintiff testified that South Suburban had therefore become "inactive" due to the loss of the listings provided by the large firms.

A number of firms who were members of South Suburban then formed a new group, the Exchange Multiple Listing Service. The formation of the Exchange group was followed shortly by the formation of the Homewood Flossmoor Board of Realtors Multiple Listing Service (not to be confused with the defendant H-F Group). This group was formed in 1972, approximately a year before this case was tried. There were approximately 18 real estate firms in the Homewood Flossmoor Board of Realtors group. The defendants were not members of this group. A number of former members of the Exchange group, however, were members of the Board of Realtors group. The Board of Realtors group covered an area which included Homewood, Flossmoor and Olympia

Fields, but also extended beyond this immediate area. From October of 1972 through November of 1973 this group sold 1,796 homes which amounted to $58,826,522 in sales. The group had only two membership requirements: that the applicant be a licensed real estate broker and that the applicant have an office located in the jurisdictional boundaries of the group's area. They did not require the applicants to be single office firms with their sole office in the area as the H-F Group did. The plaintiff, however, did not have an office in their area, and could not become a member unless she established an office there.

In addition to being a member of the South Suburban Multiple Listing Service, the plaintiff was also a member of the National Multiple Listing Service. The plaintiff estimated that her membership in the National group gave her access to about 100 listings in the south suburban area which included the Homewood-Flossmoor area.

There was testimony concerning the fact that the plaintiff had shifted her interests, in part at least, away from the south suburban area. It was earlier noted that at the time of trial the plaintiff had reduced her staff in her Harvey office to a single part-time salesperson. On December 31, 1972, the plaintiff opened an office in Evanston, Illinois. She testified she had become the renting agent for a large apartment complex being built there and she now spent a considerable amount of time in her Evanston office. She estimated that her Evanston office was about 55 or 60 miles from her Harvey office. She joined the Evanston North Shore Board of Realtors and anticipated developing a real estate brokerage business in that area in the future.

A portion of the evidence at trial concerned the amount of business the defendant H-F Group did in the Homewood-Flossmoor area in comparison to other brokers, and what impact the formation of the H-F Group had on the real estate brokerage business in that area. For the years of 1970 through 1972, the H-F Group had "listed and/or sold" 18% of the homes sold in Homewood, 41% of the homes sold in Flossmoor and 42% of the homes sold in Olympia Fields. There was no evidence concerning what percentage of the residential sales the defendant firms participated in in the years prior to the formation of the H-F Group. However, the four defendant firms were the four oldest firms in the Homewood-Flossmoor area and testimony on their operations in prior years appears to indicate that they did considerable business in the area before the formation of the H-F Group.

At the time of trial, approximately four years after the formation of the H-F Group in March of 1969, there were 60 to 70 real estate firms who were not members of the H-F Group that were doing business in the Homewood-Flossmoor area. These firms had 30 to 35 offices located

in Homewood, Flossmoor or Olympia Fields. Since the H-F Group was formed, from 8 to 12 new real estate offices were opened in the Homewood-Flossmoor area by firms who were not members of the H-F Group.

At the close of the evidence, the court sitting as a finder of fact found that the defendants had not violated the Illinois Antitrust Act. In support of its conclusion the court made a number of specific findings. As these findings are material to our disposition of this case, we set forth all of the court's findings relevant to this appeal:

"b. None of the Defendants either individually or in concert were engaged in a conspiracy to fix commissions or to limit the number of realtors operating in Homewood, Flossmoor and/or Olympia Fields, but in fact the evidence shows that approximately 60 to 70 realtors were selling residential real estate in Homewood, Flossmoor and Olympia Fields during the period of time relevant to the allegations of Plaintiff's complaint.

c. None of the Defendants either individually or in concert were guilty of unreasonably restraining the business of real estate brokerage in Homewood, Flossmoor and/or Olympia Fields.

d. None of the Defendants, either individually or in concert, sought to maintain monopoly power for the purpose of excluding competition and controlling and fixing commissions.

\* \* \*

g. There is no evidence to support the allegation that the Defendants herein did in fact limit the number of real estate brokers operating within the Homewood, Flossmoor and Olympia Fields area.

h. The Court finds that other larger listing services have in the past and presently continue to operate in Homewood, Flossmoor and Olympia Fields and vicinity, and that there is presently operating in said geographical area the Homewood-Flossmoor Board of Realtors Multiple Listing Service which has eighteen members with a total of thirty-six offices in the geographical area in question, and that said Multiple Listing Service in the last fourteen calendar months (from October, 1972 through November, 1973) has sold a total of 1,796 units of real estate and achieved a dollar sales volume in excess of $58,000,000."

On appeal, the primary question is whether the trial court was in error in finding that the evidence established that the defendants had not violated the Illinois Antitrust Act. The plaintiff contends that the trial court should have found the defendants guilty of antitrust violations based on the defendants' refusal to cooperate with other real estate brokers in sharing commissions on clients referred to them and because

the defendants barred other brokers from their multiple listing service for failure to meet what the plaintiff terms "unreasonable" membership requirements. There is no real dispute as to whether the defendants refused to cooperate with nonmember brokers or whether they had excluded brokers from their multiple listing service based upon the membership requirements that the plaintiff terms unreasonable. The membership requirements that the plaintiff complains of are that applicants must pay a $1000 entrance fee, must not employ part-time real estate salespersons and must have their sole office in Homewood, Flossmoor or Olympia Fields.

Before going to an examination of whether the defendants' conduct violated the Illinois Antitrust Act, it is necessary to discuss several features of Illinois and Federal antitrust laws. The Illinois Antitrust Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—1 et seq.) is based, in part at least, on the Federal antitrust laws. In fact, section 11 of the Illinois Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—11) instructs courts in construing the Act to follow the construction given to the Federal laws by the Federal courts, "When the language of this Act is the same or similar to the language of a Federal Anti-trust Law   *   *   *."

Under the Federal laws, antitrust violations have been divided into two types by the Federal courts, *per se* violations and activities which are found to be violations because they unreasonably restrain trade. (See *United States v. Trenton Potteries Co.*, 273 U.S. 392, 71 L.Ed. 700, 47 S. Ct. 377, which originally announced the *per se* doctrine, and *Standard Oil Co. v. United States*, 221 U.S.1, 55 L. Ed 619, 31 S. Ct. 502, and *United States v. American Tobacco Co.*, 221 U.S. 106, 55 L. Ed. 663, 31 S. Ct. 632, which initially announced the "rule of reason" test for determining when certain activities were unreasonable restraints of trade.) *Per se* violations have been defined by the Federal courts to be:

> "[C]ertain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 2 L. Ed. 2d 545, 549, 78 S. Ct. 514, 518.

Among activities found to be *per se* violations of the Federal antitrust laws by the Federal courts are price fixing, the division of markets, group boycotts and tying arrangements. *Northern Pacific Ry. Co. v. United States*, 356 U.S.1, 2 L. Ed. 2d 545, 78 S. Ct. 514.

When activities are found not to fall into the established categories

of *per se* violations, they are to be tested under the rule of reason to determine whether they are unreasonable restraints of trade. When utilizing the rule of reason, factors not considered in *per se* cases such as the "precise harm" the activities cause and the "business excuse" for their use, are to be considered. As Justice Brandeis said in *Board of Trade v. United States*, 246 U.S. 231, 238, 62 L. Ed. 683, 687, 38 S. Ct. 242, 244:

> "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

Therefore, the first question to determine is whether the defendants' conduct falls under the *per se* doctrine or whether it should be judged under the rule of reason.

The Illinois Antitrust Act differs from the Federal acts in at least one important respect. Section 3 of the Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—3) contains a subsection 3(1) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)) which lists three specific types of activities which are violations of the Act and a subsection 3(2) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(2)) which states that any concerted activity between two or more persons which unreasonably restrains trade is a violation of the Act. The first two subsections of section 3 of the Illinois Antitrust Act state:

> "Every person shall be deemed to have committed a violation of this Act who shall:
>
> (1) Make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:
>
> a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto, or the fee charged or paid for any service performed or received by the parties thereto:
>
> b. fixing, controlling, maintaining, limiting, or discontinuing

the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1);

c. allocating or dividing customers, territories, supplies, sales, or markets, functional or geographical, for any commodity or service; or

(2) By contract, combination, or conspiracy with one or more persons unreasonably restrain trade or commerce;" Ill. Rev. Stat. 1973, ch. 38, pars. 60—3(1), (2).

The Federal acts on the other hand do not have a list of specific activities as the Illinois Act does. Section 1 of the Sherman Act simply states that every concerted activity "in restraint of trade or commerce * * * is declared to be illegal." (15 U.S.C. §1 (1970).) The Federal courts, as we have previously noted, have developed two categories of violations in construing this section, *per se* violations and violations which are tested by the rule of reason. The distinction between *per se* violations and rule of reason violations at the Federal level is therefore a distinction created by the courts and not by the Congress.

When the present Illinois Antitrust Act took effect on July 21, 1965, the distinction between *per se* violations and rule of reason violations had already been well established at the Federal level. The defendants contend that the Illinois General Assembly intended to define in the Act those violations which were deemed *per se* violations, leaving all other possible violations to be judged under the rule of reason. The defendants argue that it was the intention of the General Assembly to set forth in subsection 3(1) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)) those offenses which are *per se* violations. Subsection 3(2) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(2)) was intended, they argue, to cover any other violations of the Act and these latter violations are to be dealt with under the rule of reason.

We are of the opinion that the defendants' contention as to the General Assembly's intent in drafting section 3 of the Act is correct. Authors who have examined section 3 of the Illinois Antitrust Act have also come to the same conclusion. (See Tone and Stifler, *New Illinois Trade Regulation Laws: The Antitrust Act (Part One)*, 54 Ill. B. J. 294 (1965); Curtis and Decker, *The 1969 Amendments to the Illinois Antitrust Act*, 58 Ill. B. J. 698 (1970); Atkins, *State Antitrust Enforcement and Important New Amendments to the Illinois Antitrust Act*, 58 Ill. B. J. 699 (1970).) Both the Bar Committee comments and the historical and practice notes in the Smith-Hurd Illinois Annotated Statutes (Ill. Ann. Stat., ch. 38, §60—3 (Smith-Hurd 1970)) also agree with this interpretation. Philip W. Tone and John G. Stifler, the authors of the Historical

and Practice Notes in the Smith-Hurd Annotation, in referring to subsections 3(1) and 3(2) of the Illinois Act, state that:

"Three *per se* offenses are specifically prohibited by subsection (1), while the 'rule of reason' is to be applied to the restraints of trade which fall under subsection (2)." (Ill. Ann. Stat. ch. 38, §60—3, at 845 (Smith-Hurd 1970).)

The Bar Committee Comments found in the Smith-Hurd Annotation which discuss section 11 of the Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—11) which mandates that Federal construction of Federal laws shall be followed where the Illinois Act is the same or similar in language state:

\* \* \* Section 11 should not be relied upon by the courts to find conduct which is clearly not violative of Section 3(1) to be violative of Section 3(2) of the Act, without having examined the competitive and economic purposes and consequences thereof, even though such conduct is a *per se* offense under federal law." Ill. Ann. Stat., ch. 38, §60—11, at 886 (Smith-Hurd 1970).

This division of antitrust violations into *per se* violations listed under subsection 3(1) and violations to be tested by the rule of reason under subsection 3(2) has been affirmed in *People ex rel. Scott v. Convenient Food Mart, Inc.*, 21 Ill. App. 3d 97, 315 N.E.2d 124. In that case this court held that tying agreements which have been construed by Federal courts as *per se* violations of Federal antitrust statutes, are not *per se* violations under the present Illinois Antitrust Act, and are to be tested under section 3(2) of the Act which requires the application of the rule of reason test. This court found in that case that because the legislature did not list tying agreements as one of the specific activities outlawed in subsection 3(1), it therefore did not intend to make tying agreements a *per se* violation of the Act. Therefore, in the instant appeal, if the defendants' conduct is not included in the prohibited activities listed in subsection 3(1) of the Illinois Antitrust Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)), then we must consider the defendants' conduct only in regard to the rule of reason test.

The conduct which the plaintiff primarily urges as a *per se* violation of the Act is the defendants' concerted refusal to deal with the plaintiff and other real estate brokers. The evidence established that the defendants had agreed in writing not to share listings or commissions with real estate brokers who were not members of the defendants' multiple listing service. The plaintiff concedes that the Illinois Act differs from the Federal antitrust law in that the Illinois Act does not view every concerted refusal to deal as a *per se* violation of its laws. The plaintiff still maintains that the defendants' activities, especially in light of their

"purpose," fall within the *per se* categories listed in subsection 3(1) of the Act. We shall therefore examine the three types of activities forbidden under subsection 3(1) of the Act.

■■ Subsection 3(1)(a) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)(a)) makes any concerted activity which is for the purpose of fixing prices a violation of the Act. On appeal, the plaintiff has raised in her brief only two matters concerning the defendants' conduct: their agreement to refuse to deal with nonmember brokers and their "unreasonable" membership requirements. Neither of these provisions in the defendants' agreement relates to the fixing of prices nor does the plaintiff's brief or the evidence at trial show any connection between these provisions and any price fixing scheme. The plaintiff's attorney did urge orally before this court that there was in fact an agreement between the defendants to fix their rate of commissions. However, because this issue has not been raised by the plaintiff in her brief, the plaintiff has waived her right to have this separate issue considered by this reviewing court. (*Consolidated Construction Co. v. Malan Construction Corp.*, 42 Ill. App. 2d 272, 192 N.E.2d 263; *Corbett v. Devon Bank*, 12 Ill. App. 3d 559, 299 N.E.2d 521; *Rudolph v. Gersten*, 100 Ill. App. 2d 253, 241 N.E.2d 600.) We also note that the trial court found specifically that the defendants had not conspired to fix commissions.

Subsection 3 (1)(b) of the Act (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)(b)) prohibits agreements to fix, control, maintain, limit or discontinue the sale or supply of any commodity or service. We find no evidence that the defendants have made any agreement to regulate the amount of services performed or commodities sold in the real estate brokerage business. The final subsection, 3(1)(c) (Ill. Rev. Stat. 1973, ch. 38, par. 60—3(1)(c)), prohibits an agreement between competitors which allocates or divides customers, territories or markets in a functional or geographical manner. There is no evidence that the defendants have agreed to divide up the real estate market among themselves and in fact their agreement is aimed at sharing all the customers throughout the area, allowing any of their members to sell homes which other members have listed.

We find that the defendants' conduct does not fall within any of the three categories of *per se* violations listed in subsection 3(1) of the Act. While a concerted refusal to deal has been found to be a *per se* violation of Federal laws (*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 3 L. Ed. 2d 741, 79 S. Ct. 705), it is not a *per se* violation of the Illinois Antitrust Act because the legislature intended only those activities listed in subsection 3(1) to be dealt with as *per se* violations.

The conclusion that a concerted refusal to deal is not a *per se* violation of the Illinois Antitrust Act was also reached by the authors of the Bar Committee comments in the Smith-Hurd Annotation. Ill. Ann. Stat., ch. 38, §60—3, at 842 (Smith-Hurd 1970).

Having determined that the defendants' activities are not *per se* violations of the Illinois Antitrust Act, we turn to the remaining question whether they constitute an unreasonable restraint of trade in violation of subsection 3(2) of the Act. (Ill. Rev. Stat. 1973, ch. 38, par. 60—3 (2).) In determining whether there has been a violation of subsection 3(2), the rule of reason should be applied. (*People ex rel. Scott v. Convenient Food Mart, Inc.*, 21 Ill. App. 3d 97, 315 N.E.2d 124.) In our earlier quotation from Justice Brandeis' opinion in *Board of Trade v. United States*, 246 U.S. 231, 62 L. Ed. 683, 38 S. Ct. 242, some of the factors were set forth which the finder of fact should consider under the rule of reason in determining whether certain activity has unreasonably restrained trade. Those factors included the purpose of the defendants in entering into the activity, the nature of the activity, and the probable or actual effect the activity had on the industry in general and on competition within that industry. The focus of inquiry under the rule of reason, therefore, is not merely to examine what the defendants are doing, but to also examine why they are doing it and what effect their activity has had on competition in their industry.

The findings of the trial court in our case dealt directly with these factors. The court considered the defendants' purpose in entering into their agreement to form a multiple listing service. It found that the defendants had not individually or in concert, conspired to fix commissions, had not conspired to limit the number of competing realtors in their area, had not conspired to unreasonably restrain trade and had not sought to maintain monopoly power in the local real estate business. The court then went on to examine the effect of the defendants' formation and operation of their multiple listing service. The court found that there was no evidence to support the allegation that the defendants had in fact limited the number of real estate brokers operating in the Homewood, Flossmoor and Olympia Fields area. It found that 60 to 70 realtors who were not members of the defendants' group were selling residential real estate in those three villages and that a second multiple listing service was doing a substantial amount of business in the same area.

We are of the opinion that the court's factual findings demonstrate that it correctly applied the rule of reason test to the defendants' activities. The only ground left for reversing the court's judgment would be that those findings were against the manifest weight of the evidence.

*Turner v. Board of Education,* 54 Ill. 2d 68, 294 N.E.2d 264; *Brown v. Zimmerman,* 18 Ill. 2d 94, 163 N.E.2d 518; *Griffith v. YMCA,* 7 Ill. App. 3d 1040, 288 N.E.2d 718.

■■ Regarding the court's finding that the defendant's purpose in agreeing to form the H-F Group Multiple Listing Service was not to limit competition in any way, there was no direct evidence to demonstrate a contrary conclusion. The presidents or partners in the four member firms all testified about their purpose in forming the group. Their theme throughout was that they were primarily concerned about providing better service to their clients by insuring that all the sales arranged through the H-F Group would be conducted by firms and sales people who were intimately familiar with the Homewood, Flossmoor and Olympia Fields area and with the homes they were selling.

The court's finding that the defendants' activity had not limited the number of real estate brokers doing business in the Homewood, Flossmoor and Olympia Fields area was also supported by the evidence. While there was evidence that the defendants' H-F Group did a substantial amount of business in the area, there was no evidence that the formation of the H-F Group increased the defendants' share of the market. On the contrary, there was evidence that the defendants' competitors had increased their business in the area since the inception of the H-F Group. There was testimony that 8 to 12 new real estate offices had been opened in the area by the defendants' competitors since the defendants had formed their multiple listing service. There were 60 to 70 firms doing business in the area and 30 to 35 real estate offices of competitors located in the area at the time of trial. We are of the opinion that the court's findings were not against the manifest weight of the evidence.

The plaintiff has cited several cases from other States which determined that certain multiple listing services had violated those States' antitrust laws. Several of the cases the plaintiff cites (*Oates v. Eastern Bergen County Multiple Listing Service, Inc.* (1971), 113 N.J. Super. 371, 273 A.2d 795; *Collins v. Main Line Board of Realtors* (1973), 452 Pa. 342, 304 A.2d 493) were decided under the *per se* doctrine and are not applicable to our situation in Illinois where the activities our defendants were charged with are to be dealt with under the rule of reason. *Grillo v. Board of Realtors* (1966), 91 N.J. Super. 202, 219 A.2d 635, which is a rule of reason case, is distinguishable on its facts. In *Grillo* the plaintiff alleged that the defendant multiple listing service controlled the great majority of listings for residential property in its area, and the trial court found that the defendant's activity had tended to stifle rather than promote competition and that the plaintiff's profits

had been diminished by the defendants' activities. Such facts or findings are not present in our case.

A case with facts more similar to our case in *Grempler v. Multiple Listing Bureau of Harford County, Inc.* (1970), 258 Md. 419, 266 A.2d 1, which utilized the rule of reason test in finding that there had been no violation of Maryland antitrust laws by the defendant multiple listing service. The plaintiff in *Grempler* charged that his being barred from membership in the multiple listing service because of the defendants' membership requirement that an applicant have its principal office in the jurisdictional area of the defendant service was an unreasonable restraint of trade. In *Grempler*, as in our case, only a small percentage of the real estate brokers in the area were members of the multiple listing service. The court found that the defendants' activity did not unreasonably restrain trade and noted that the plaintiff could have joined the group if he was willing to move his principal office into the defendant group's area. Such a move would merely require the plaintiff to make an "economic decision" rather than act as an absolute bar to the plaintiff expanding his business into the area, the court reasoned.

We are of the opinion that the trial court in the instant appeal has properly applied the law and that its findings are supported by the evidence. In so holding, we have not determined that refusal to deal clauses in multiple listing service agreements or membership requirements such as those the defendants have may never be found to violate the Illinois Antitrust Act. We only find that such cases must be dealt with on a case-to-case basis and be determined by examining the purpose and the impact of each such arrangement.

Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.