TROWBRIDGE FARM SUPPLY CO., INC., Plaintiff-Appellant, *v.*
W. R. GRACE AND CO. *et al.*, Defendants-Appellees.—(OCCIDENTAL
PETROLEUM CORPORATION *et al.*, Defendants.)

Fourth District    No. 15580

Opinion filed April 11, 1980.

Robert D. Owen and Marshall A. Susler, both of Owen, Roberts, Susler & Murphy, of Decatur, for appellant.

Francis D. Morrissey, Michael K. Murtaugh, and Richard H. Donohue, all of Baker & McKenzie, of Chicago, for appellee W. R. Grace & Company.

Garrett B. Johnson, of Kirkland & Ellis, of Chicago, for appellees Allied Chemical Corporation and Dean Keller.

Thomas F. Gardner, of Kirkland & Ellis, of Chicago, for appellee Olin Corporation.

Mr. JUSTICE GREEN delivered the opinion of the court:

This case involves a civil suit brought under the Illinois Antitrust Act (Ill. Rev. Stat. 1977, ch. 38, par. 60—1 *et seq.*).

Plaintiff Trowbridge Farm Supply Co. (TFS) appeals from a judgment of the circuit court of Macon County entered on June 6, 1978, on a verdict directed against it at the close of the presentation of its case. The judgment was entered in favor of defendants W. R. Grace and Co. (Grace), Allied Chemical Corporation (Allied), Olin Corporation (Olin), and several individual employees of those corporations. After entering the judgment, the trial court (1) granted a mistrial as to the remaining defendants to the suit, Occidental Petroleum Corporation (Occidental) and two of its employees, and (2) made a finding, pursuant to Supreme Court Rule 304(a)(73 Ill. 2d R. 304(a)) that no just reason existed to delay appeal of the judgment.

The complaint alleged that defendants damaged TFS by conspiring to fix prices, fix production levels, or unreasonably restrain trade as prohibited by sections 3(1)(a), 3(1)(b), and 3(2) of the Act (Ill. Rev. Stat., ch. 38, pars. 60—3(1)(a), 60—3(1)(b), 60—3(2)), respectively. TFS presented no evidence which can be accurately characterized as tending to prove that defendants engaged in price fixing or the fixing of production levels and plaintiff conceded as much in a post-trial motion to set aside the directed verdicts. The essence of TFS' contention is that it presented sufficient evidence to go to the jury that defendants conspired to unreasonably restrain trade by their concerted efforts to interfere with and defeat a favorable sales contract it had with Sinclair Oil Corporation (Sinclair). The statutory basis for this ground is section 3(2) of the Act which provides:

"3. Every person shall be deemed to have committed a violation of this Act who shall:

(1) * * *; or

(2) By contract, combination, or conspiracy with one or more other persons unreasonably restrain trade or commerce." Ill. Rev. Stat. 1977, ch. 38, par. 60—3(2).

Section 3(1) and (2) was modeled on section 1 of the Sherman Act (26 Stat. 209 (1890), 15 U.S.C.A. §1 (1975)).

Evidence presented by TFS but not concerning the defendants, in whose favor directed verdicts were granted, tended to establish the following set of facts.

TFS was incorporated in 1967 for the purpose of wholesale marketing of fertilizer. Anhydrous ammonia is an agricultural fertilizer widely used in the farm belt, but its sale was not a substantial part of plaintiff's business in 1967 and 1968. In late 1968, Jack Shirley, a salesman for Sinclair, approached Robert Trowbridge, owner of TFS, attempting to sell a sizable tonnage of anhydrous ammonia to TFS. Sinclair had built a substantial production facility for this type of fertilizer at Fort Madison, Iowa, and was expecting to go into production on February 10, 1969. The parties eventually orally agreed to a sale by Sinclair to TFS of 10,000 tons, with TFS to have the option of taking an additional 10,000 tons at the same price. That price was $30 per ton if delivered by rail and $31.50 if delivered by truck. Both required delivery only within the State of Illinois. Upon receiving confirmation of the sale from Shirley by telephone on February 4, 1969, Trowbridge contracted with TFS customers to furnish them with this fertilizer.

During the period in question, most anhydrous ammonia was sold and applied in the spring. Shirley told Trowbridge that Sinclair anticipated having enough of this fertilizer to meet contract commitments for the 1969 season because of the new plant. He also told Trowbridge that Sinclair was quoting low prices to wholesalers in order to try to corner this market. During the 1968 season the actual price for sale to wholesalers had ranged between $40 to $50 per ton with price lists from producers stating a purported price of from $45 to $60 per ton.

On February 12 and 13, 1969, a conference on fertilizer dealership and company operations, sponsored by the National Plant Food Institute, was held at the Palmer House in Chicago. During the conference, Dwayne Shanle, a TFS employee, was at his home office when he received a phone call from Jim Burfield of Occidental in which Burfield told him that the ammonia market was being "torn up" by the fact that the TFS contract price was so far below the price at which the major companies were selling ammonia. Burfield indicated that TFS was selling ammonia in the vicinity of $35 a ton and the major companies were selling

at around $50 per ton. Burfield advised Shanle to get Trowbridge to leave the Palmer House conference.

A day or two after the conference, Sinclair phoned Trowbridge and told him that tonnages for one of TFS' customers had been approved but a few days later Sinclair phoned again to say that Sinclair would not honor its commitment to TFS. A few days later Trowbridge had a phone conversation with Robert C. Moreau, a superior of Shirley's at Sinclair, who also stated that Sinclair would not honor the contract. On February 26, 1969, and after Trowbridge had his attorney contact Sinclair, Moreau met with Trowbridge at Decatur and told Trowbridge that Sinclair was having trouble with production at the Fort Madison facility but that Sinclair would try to get TFS its fertilizer. Trowbridge then agreed to try to get its customers to reduce their orders. In early March 1969, Sinclair sent Trowbridge a document purporting to be a form to express their contract in writing but the document contained a price escalation clause which was not part of their oral agreement. In early April Trowbridge agreed to sign the document as presented, thus agreeing to the escalation clause.

On April 12, 1969, TFS obtained its first delivery under the contract when one of its customers who transported the fertilizer himself was supplied with 2400 tons at a Sinclair distribution facility at Peru, Illinois. Although TFS had been informed that the fertilizer could be obtained there, the customer was given service only after phoning Sinclair's Chicago office. Then the customer was required to wait in line with his trucks while other trucks arriving later were served first. Subsequently, Moreau informed Trowbridge by phone that no more ammonia would be available at the Peru facility and that, if possible, he would arrange for TFS to get the balance of the fertilizer contracted for from companies with which it had agreements to do this. Agreements were apparently common in the trade whereby one company would furnish fertilizer to customers of another company when the first company's facilities were much closer to the company. Accounts between the companies would then be kept with the accounts being balanced by reciprocal furnishing of these services. For a while TFS was able to obtain some of the contracted fertilizer through an Apple River Company terminal at Niota, Illinois, but was cut off from that in June 1969 and told by an agent of Sinclair that it could not fulfill the balance of the contract.

Various witnesses testified to believing or having heard conversations among persons in the fertilizer business that the price under the Sinclair-TFS contract was very low. Evidence was also introduced of persons in the business having said that they did not think (1) Sinclair would fulfill its contract with TFS, and (2) TFS would be able to fulfill its contracts with its customers.

Before we turn to a discussion of the evidence which TFS relies upon to establish its case against the defendants in whose favor a verdict was directed, it is important that we remember that they are charged under section 3(2) of the Illinois Antitrust Act with contracting, contriving, or conspiring among themselves and with others to "unreasonably restrain trade or commerce." There was no direct evidence that any of them did so. The evidence, if any, that they did this was purely circumstantial. Several rules concerning proof by circumstantial evidence of conspiracy in civil cases have been stated by the courts.

The defendants rely upon *Tribune Co. v. Thompson* (1930), 342 Ill. 503, 529, 174 N.E. 561, 571-72, a civil case where a conspiracy was charged. In reversing a decree for the plaintiffs, the court there stated:

> "[W]hile conspiracy may be proved by indirect or circumstantial evidence such evidence must be clear and convincing, and if the facts and circumstances relied upon are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved and to enter a decree dismissing the bill for want of equity. [Citations.]"

Recently, in *Alm v. General Telephone Co.* (1975), 27 Ill. App. 3d 876, 327 N.E.2d 523, we followed *Thompson* in noting that in a civil case, proof of conspiracy must be clear and convincing if made solely by circumstantial evidence.

Plaintiff argues that the evidence against all three defendants taken together, and in combination with the evidence against Occidental, shows consciously parallel conduct which is sufficient to establish a *prima facie* case of conspiracy. A theory has developed from cases under the Sherman Act that when business entities consciously engage in the same conduct, such as charging the same prices, the trier of fact may infer that they have an agreement to do so. The theory originated in *Interstate Circuit, Inc. v. United States* (1939), 306 U.S. 208, 83 L. Ed. 610, 59 S. Ct. 467. There, a movie theater chain wrote to and met with eight movie distributors, who had offices in the same city, demanding the distributors require their exhibitors to (1) charge minimum admission, and (2) not show first run films as part of double features. The distributors all complied to about the same extent. This concerted action plus the motive the distributors had to comply only if all did, was held sufficient to support a finding of conspiracy among the distributors.

In *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.* (1954), 346 U.S. 537, 540-41, 98 L. Ed. 273, 279, 74 S. Ct. 257, 259-60, the court explained that proof of parallel business behavior "is admissible circumstantial evidence from which the finder of fact may infer agreement" and may help support a finding of conspiracy, but is not sufficient by itself to conclusively establish an agreement or a Sherman

Act violation. Evidence that the entities who engaged in parallel behavior also knew of the conduct of each other would also be required because:

> "The substantive law of trade conspiracies requires some consciousness of commitment to a common scheme. [Citation.] It has been stated there is no such thing as an 'unwitting conspirator.' [Citation.] Unless the individuals involved understood from something that was said or done that they were, in fact, committed to raise prices [or to restrain trade], there was no violation of the Sherman Act." *United States v. Standard Oil Co.* (7th Cir. 1963), 316 F.2d 884, 890.

With the above rules in mind we now examine the evidence which TFS claims to be sufficient to have made *prima facie* cases as to the various defendants.

Evidence of liability on the part of W. R. Grace and Co., and their employees, L. L. Jaquier, Walter Whitlock, and Paul Marshall, was as follows. At the Palmer House conference in 1969 Mr. Whitlock approached Robert Trowbridge and in a brief conversation offered to buy TFS' contract rights with Sinclair. At the same conference, John Herrin, a TFS customer, was advised by someone from Grace to be cautious as to the reliability of his source of supply of anhydrous ammonia. Gary Cooper, who had a Sinclair contract for anhydrous ammonia on similar price terms to that of TFS, spoke with Walter Whitlock, of Grace, at the conference. Whitlock told Cooper that he did not understand how anyone could deliver anhydrous at the price Cooper had contracted for with Sinclair.

The offer by Grace to buy would constitute some evidence of an attempt by Grace to restrain trade. Evidence had been presented that the market was glutted at the time and under those circumstances purchase of such fertilizer by a producer from a wholesaler would have been most unusual. Although the Sinclair sales price was low, TFS would not be likely to sell the fertilizer to Grace at a much lower price than it could sell it to its own customers. The inference arising from this offer would be that Grace intended to keep fertilizer from the low-priced Sinclair contract from entering and depressing the market. On the other hand, the statements made to Herrin and Cooper were natural statements for a producer's agents to make to those who were receiving fertilizer directly or indirectly from a competitor. It did nothing to keep TFS from getting fertilizer from Sinclair. A trier of fact could not infer from the statement to Herrin that Grace knew of action by others to try to keep the cheap Sinclair fertilizer off the market because it would be at least as likely that the Grace spokesman merely had knowledge that Sinclair was having trouble starting up its operation. (*Thompson.*) Similarly the same innocent construction rule would negate an inference that Grace's motive

was to punish TFS for contracting with Sinclair and placing low cost fertilizer on the market rather than merely trying to get Herrin to trade with Grace customers or merely trying to be helpful to Herrin. The statement to Cooper showed that Grace knew of the low price of the TFS Sinclair contract. This would show a motive on Grace's part to attempt to keep that fertilizer off the market but nothing more.

The evidence against Allied Chemical Corporation, and its employee, Dean Keller, consisted of one conversation between Keller and Trowbridge at the Palmer House conference. Keller asked Trowbridge if Trowbridge's sizable ammonia contract was available for sale. Although not a direct offer on the part of Allied Chemical Corporation to purchase the TFS-Sinclair contract, the inference is reasonable and logical that Keller was inquiring about the status of the contract with the possibility in mind of purchasing it for Allied. It can be inferred that this, like Grace's offer to purchase the contract, was done with the idea of keeping the low-price TFS fertilizer off the market.

The case against Olin consisted entirely of the following evidence of their dealings with Gary Cooper relative to Cooper's anhydrous ammonia contract with Sinclair. Cooper told Olin about his offer from Sinclair because it had previously been Cooper's supplier. They had an arrangement whereby Cooper agreed to give Olin a first refusal on any offer to supply him with anhydrous ammonia and Olin furnished Cooper with 12 1,500 gallon "nurse tanks" for use in delivering anhydrous ammonia from his plant to various farms. Olin's agents told Cooper that they could not meet Sinclair's offer and that they would take back the tanks if he accepted it. When Cooper accepted Sinclair's offer, Olin took back the tanks. At the Palmer House conference, Olin's representative told Cooper they did not think he would be able to get his product from Sinclair.

Neither Olin's refusal to meet Sinclair's price nor its taking away the nurse tanks when Cooper started doing business with Sinclair gives rise to any inference of an intent to restrain trade or to defeat the contract between TFS and Sinclair. The statement of Olin's representative to Cooper that he didn't think that Sinclair would be able to meet its contract is subject to the same innocent construction inference that was applicable to the statement of the Grace representative to Herrin. Furthermore, as there is no indication of conduct by Olin which constitutes any attempt to restrain trade, knowledge on its part of that type of conduct by others would not be sufficient to make it liable.

■■ The general rule upon the propriety of the trial court directing verdicts in civil cases is that:

> "[V]erdicts ought to be directed * * * only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary

verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.)

Here, as TFS relied entirely on circumstantial evidence in attempting to prove its case, the strength of its proof required to avoid a directed verdict would have to be greater than in a case where its burden of proof before the jury was only by a preponderance of the evidence. *Thompson, Alm.*

■ The directed verdicts here were proper. No judgment against those defendants based upon the evidence presented by TFS could ever stand. Any inference of a contract, combination or conspiracy to restrain trade between any defendant for whom a verdict was directed with any other defendant or with any other person or entity would have to arise, if at all, from the conscious parallel conduct theory of *Interstate Circuit, Inc.* No evidence was presented that Allied or its employees had any knowledge of any conduct of others tending to unreasonably restrain trade. Evidence of any such knowledge upon the part of Grace or Olin or any of their employees would have to arise from inferences that they had this knowledge because of predictions by their employees that Sinclair would not perform. The innocent construction rule of *Thompson* prevents any such inference arising from those statements. Furthermore, we note that as far as Olin is concerned, there is no evidence of any conduct upon the part of any of its employees that would be in restraint of trade even if done in concert with others.

Accordingly, we affirm the judgments entered on the directed verdicts and remand to the trial court for further proceedings as to the remaining defendant.

Affirmed and remanded.

MILLS, P. J., and TRAPP, J., concur.