MAUREEN BAKER *et al.*, on Behalf of Themselves Indiv. and of All Others Similarly Situated, Plaintiffs-Appellants, v. JEWEL FOOD STORES, INC., Defendants-Appellees.

First District (3rd Division)   No. 1—03—1002

Opinion filed January 12, 2005.

Connelly, Roberts & McGivney, L.L.C. (Michael P. Connelly, William E. Snyder, and Thomas R. Rakowski, of counsel), and Rock, Fusco & Garvey, Ltd. (Philip J. Rock, Andrew M. Hale, Kevin W. Horan, and John J. Rock, of counsel), both of Chicago, for appellants.

Latham & Watkins, L.L.P. (Gregory P. Lindstrom, Timothy B. Hardwicke, Kevin C. May, and Matthew B. Mock, of counsel), McDermott, Will & Emery (Wilber H. Boies, P.C., David Marx, Jr., and Lizabeth A. Boyer, of counsel), and Tabet, Divito & Rothstein, L.L.C. (Gina L. DiVito, of counsel), all of Chicago, for appellees.

PRESIDING JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiffs, Chicago area consumers who purchased milk at retail from defendants Jewel Food Stores, Inc. (Jewel), and Dominick's Finer Foods, Inc. (Dominick's), for the period from August 23, 1996, to August 23, 2000, filed a class action against defendants alleging that defendants conspired to fix, raise and maintain the price of milk in the Chicago area in violation of section 3(1)(a) of the Illinois Antitrust Act (740 ILCS 10/3(1)(a) (West 2002)) (the Antitrust Act or the Act). Plaintiffs appeal from the trial court's grant of defendants' motion for judgment at the close of plaintiffs' case pursuant to section 2—1110 of the Illinois Code of Civil Procedure (735 ILCS 5/2—1110 (West 2002)) (the Code). Plaintiffs argue that the court incorrectly applied section 2—1110 by (1) requiring plaintiffs to prove their case by clear and convincing evidence; (2) failing to find that plaintiffs proved a *prima facie* case; (3) requiring plaintiffs to present evidence of a manifest agreement and illicit motive in order to prove the price-fixing conspiracy; and (4) excluding all evidence regarding defendants' milk prices after the date plaintiffs commenced their action. We affirm.

## BACKGROUND

Defendants are the two dominant grocery store chains in the nine-county Chicago metropolitan area and have been for a number of years. They maintain a relatively stable share of the retail grocery market, with Jewel's market share approximating 42% and Dominick's 26%. The remaining 32% of the market is split among other grocery store chains, with no single chain having more than 6% of the market. On a store-by-store basis, Dominick's identified Jewel as its chief competitor for 90% of its stores.

All of the grocery stores sell milk, as do numerous other venues such as convenience stores and gasoline stations. Milk is a homogeneous product. It is available in various fat contents, whole, 2%, 1% and skim, but the milk within each fat category is the same, regardless of who is selling it or the brand under which it is sold. Although defendants both sell "premium" and "secondary" brands of milk, there is no difference between the premium and secondary brand milk. Only the brand names differ. Jewel's two product lines are Dean's and Fieldcrest and Dominick's are Dominick's and Nancy Martin.

Although the wholesale prices for the different types of milk differ depending on the fat content, defendants both charge the same retail price for each type of milk within a brand, setting the price based on the cost of the higher-priced whole milk rather than using an average

cost of the four milk types. As part of Dominick's milk pricing strategy, it exactly matches the price Jewel charges for premium brand milk as soon as possible after Jewel changes its milk price. Dominick's performs daily checks of Jewel stores and advertisements in order to keep abreast of Jewel's prices.

Dominick's also matches Jewel's price for secondary brand milk in those Chicago markets where Jewel is its major competitor. Defendants each price their secondary brand at 10 cents per gallon less than the premium brand in those markets, no matter the price charged for the premium brand. Therefore, each time Jewel changes its premium brand prices, its secondary brand prices will adjust similarly. Dominick's then follows Jewel's lead and prices its secondary brand accordingly. In neighborhoods where Jewel and Dominick's are not each other's nearest competitor, they each set their secondary brand milk prices based on the prices set by other competitors. Defendants' prices in those neighborhoods are generally lower than prices charged in markets where each is the other's closest competitor. For approximately 90% of its stores, Jewel is Dominick's closest competitor and in those markets, Dominick's matches Jewel's base price for both milk brands.

In 2000, Jewel's premium brand milk was priced at $2.38 per gallon in Milwaukee while the identical milk was sold in Chicago for $3.69 per gallon. When the wholesale price of milk decreased by 40 cents per gallon in December 1999, defendants did not decrease the prices they charged until after the instant suit was filed in late 2000. In markets where Jewel and Dominick's were each other's closest competition, Jewel's gross profit margin on its milk products exceeded 40% while Dominick's exceeded 50%, except when it ran its $1 off promotions at which time its profit margin still exceeded 40%.

On August 23, 2000, considering defendants' milk prices exorbitant given the market and the wholesale cost of milk, plaintiffs filed a class action against defendants alleging that defendants worked together to maintain an artificially high price for milk in the Chicagoland area in violation of section 3(1)(a) of the Antitrust Act. Following class certification, plaintiffs presented their case, at the close of which defendants moved for a finding in their favor pursuant to section 2—1110 of the Code and dismissal of the action. The court granted defendants' motion and plaintiffs appeal.

## ANALYSIS

### Standard of Review

■ The court granted defendants' motion for a finding in their favor, filed at the conclusion of plaintiffs' case in chief pursuant to sec-

tion 2—1110 of the Code, and dismissed the case. Section 2—1110 provides that in cases tried, as here, without a jury, a defendant may, at the close of the plaintiff's case, move for a finding or judgment in his or her favor. 735 ILCS 5/2—1110 (West 2002); *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275, 786 N.E.2d 139, 148 (2003). Plaintiffs argue that we should review the court's decision *de novo* while defendants argue that we should review it under the manifest weight of the evidence standard. For the reasons that follow, we agree with defendants and must, therefore, determine whether the court's decision was against the manifest weight of the evidence.

■ In ruling on a section 2—1110 motion, a court must engage in a two-prong analysis. *People ex rel. Sherman*, 203 Ill. 2d at 275, 786 N.E.2d at 148. The court must first determine, as a matter of law, whether the plaintiff has presented a *prima facie* case. *People ex rel. Sherman*, 203 Ill. 2d at 275, 786 N.E.2d at 148. A *prima facie* case is established by presenting "at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *People ex rel. Sherman*, 203 Ill. 2d at 275, 786 N.E.2d at 148, quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154, 407 N.E.2d 43 (1980). Should the plaintiff fail to meet this burden, the court must grant the motion and enter judgment in the defendant's favor, dismissing the action. 735 ILCS 5/2—1110 (West 2002); *People ex rel. Sherman*, 203 Ill. 2d at 275, 786 N.E.2d at 148. Because a court's determination that a plaintiff failed to present a *prima facie* case is a question of law, we review such a ruling *de novo*. *People ex rel. Sherman*, 203 Ill. 2d at 275, 786 N.E.2d at 148.

If the court determines that the plaintiff has established a *prima facie* case, the court then moves to the second prong of the inquiry in which, as the finder of fact, it must consider the totality of the evidence presented, including any evidence that is favorable to the defendant. *People ex rel. Sherman*, 203 Ill. 2d at 275-76, 786 N.E.2d at 149. Pursuant to section 2—1110, the court does not view the evidence in the light most favorable to the plaintiff but rather must "weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence" (735 ILCS 5/2—1110 (West 2000)) and draw reasonable inferences therefrom. *People ex rel. Sherman*, 203 Ill. 2d at 276, 786 N.E.2d at 149. Since the weighing process involves consideration of evidence presented by the defendant as well as by the plaintiff, the process "may result in the negation of some of the evidence presented by the plaintiff." *People ex rel. Sherman*, 203 Ill. 2d at 276, 786 N.E.2d at 149. After weighing the quality of all of the evidence presented by both parties, "the court should determine, applying the standard of proof required for the underlying cause,

whether sufficient evidence remains to establish the plaintiff's *prima facie* case." *People ex rel. Sherman*, 203 Ill. 2d at 276, 786 N.E.2d at 149. If the court finds that the plaintiff failed to present sufficient evidence to establish its *prima facie* case, the court should grant the defendant's motion and enter a judgment dismissing the action. *People ex rel. Sherman*, 203 Ill. 2d at 276, 786 N.E.2d at 149. We will not reverse such a ruling unless it is contrary to the manifest weight of the evidence. *People ex rel. Sherman*, 203 Ill. 2d at 276, 786 N.E.2d at 149.

The court's order stated that the court "reviewed the evidence, considering the credibility of the witnesses and the weight and quality of the evidence," and stated the court's findings as to what the "credible evidence" showed. The court determined that there were no facts regarding agreements, handshakes or conversations between defendants about the price of milk or other commodities during the class period and, therefore, no direct evidence of a conspiracy. The court then applied the clear and convincing standard of proof and determined that, although there was "some evidence" of parallel pricing, there was no additional evidence to support an inference that defendants conspired to fix the price of milk. The court found "no adequate facts demonstrating conspiracy" and held for defendants on their section 2—1110 motion. Under a section 2—1110 analysis, the credibility of witnesses, weight and quality of the evidence and underlying evidentiary standard are not considered unless the second prong of the analysis is reached. Since the court here did reach the second prong of the analysis, it had found that plaintiffs satisfied the first prong. Only after then considering *all* of the evidence under the second prong did the court find that the evidence was insufficient to sustain plaintiffs' case. Accordingly, given the court's weighing of the evidence, we consider the court's second-prong finding in favor of defendants under the manifest weight of the evidence standard of review. See *People ex rel. Scott v. Convenient Food Mart, Inc.*, 21 Ill. App. 3d 97, 110, 315 N.E.2d 124, 135 (1974).

## Underlying Standard of Proof

Plaintiffs argue that the trial court erred in applying the clear and convincing standard of proof. Plaintiffs charged defendants with horizontal price-fixing, conspiring to fix the price of milk in violation of section 3(1)(a) of the Illinois Antitrust Act. Therefore, in ruling on defendants' section 2—1110 motion, the trial court should have (1) determined if plaintiffs offered evidence so as to establish a *prima facie* case of horizontal price-fixing and, if so, then (2) weighed the evidence under the salient standard of proof to determine whether a

*prima facie* case still exists. *Greenwald v. Spring Hill Ford, Inc.*, 173 Ill. App. 3d 857, 860, 527 N.E.2d 1095, 1097 (1988). Generally, in ruling on a section 2—1110 motion, such evidence must prove plaintiffs' case by a preponderance of the evidence; "however, when the underlying cause of action requires a clear and convincing standard of proof, the evidence must meet the higher standard." *Greenwald*, 173 Ill. App. 3d at 861, 527 N.E.2d at 1097-98.

■ The Antitrust Act is intended to preserve the freedom of consumers to buy in the open marketplace and to maintain freedom of competition. *People ex rel. Scott*, 21 Ill. App. 3d at 104, 315 N.E.2d at 130-31. To that end, section 3(1)(a) of the Antitrust Act is meant to prevent competitors or would-be competitors from joining forces to fix prices. *People ex rel. Scott*, 21 Ill. App. 3d at 104-05, 315 N.E.2d at 131. Section 3(1)(a) provides that it is a violation of the Act for anyone to

> "[m]ake any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person:
> a. for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or bought by the parties thereto, or the fee charged or paid for any service performed or received by the parties thereto[.]" 740 ILCS 10/3(1)(a) (West 2002).

Price-fixing is so restrictive of free trade that it is considered a *per se* violation of the Antitrust Act, without regard to "the competitive and economic purposes and consequences" of the price-fixing. 740 ILCS Ann. 10/3(1), Committee Comments—1967, at 15 (Smith-Hurd 2002); *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 309, 430 N.E.2d 1005, 1009 (1981); *People ex rel. Scott*, 21 Ill. App. 3d at 104, 315 N.E.2d at 131.

■ The Antitrust Act does not specify which evidentiary standard of proof should be applied to cases brought under the Act. Generally, therefore, courts would apply the preponderance of the evidence standard of proof applicable to most civil litigation. However, a section 3(1)(a) horizontal price-fixing conspiracy " 'can seldom be proved by the evidence of witnesses to the effect that the parties have entered into a specific, oral or written agreement for that purpose. The proof usually consists of evidence of circumstances from which that conclusion follows.' " *People ex rel. Scott v. College Hills Corp.*, 91 Ill. 2d 138, 147, 435 N.E.2d 463, 467 (1982), quoting *United States v. Johns-Manville*, 67 F. Supp. 291, 293 (N.D. Ill. 1941). Therefore, antitrust conspiracies often have to be proven from inferences drawn from circumstantial evidence. *People ex rel. Scott*, 91 Ill. 2d at 146, 435 N.E.2d at 467, citing *United States v. Parke, Davis & Co.*, 362 U.S. 29,

44, 4 L. Ed. 2d 505, 515, 80 S. Ct. 503, 511 (1960). Plaintiffs stated in their pretrial memorandum that they would "prove their case with circumstantial evidence." For the reasons that follow, we find that where there is no direct evidence of a price-fixing conspiracy and such is provable solely by circumstantial and inferential evidence, the court should apply the clear and convincing standard of proof.

■ Similarly, horizontal price-fixing is a *per se* violation of section 1 of the Sherman Act (15 U.S.C. § 1 (2000)). *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 356 (3d Cir. 2004). Section 3(1) is patterned after section 1 of the Sherman Act. *People ex rel. Scott*, 91 Ill. 2d at 150, 435 N.E.2d at 469. Pursuant to section 11 of the Antitrust Act, when the language of the Antitrust Act "is identical or similar to that of a federal antitrust law," courts "shall use the construction of the federal law by the federal courts as a guide in construing" the Act. 740 ILCS 10/11 (West 2002); *Gilbert's Ethan Allen Gallery v. Ethan Allen, Inc.*, 162 Ill. 2d 99, 102, 642 N.E.2d 470, 472 (1994); *People ex rel. Scott*, 21 Ill. App. 3d at 106-07, 315 N.E.2d at 132. Illinois courts can, therefore, use federal case law interpreting section 1 of the Sherman Act as a guide in interpreting section 3(1). *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 103, 642 N.E.2d at 472; *People ex rel. Scott*, 91 Ill. 2d at 150, 435 N.E.2d at 469. However, "[t]he Federal decisions are not binding on our courts." *Gilbert's Ethan Allen Gallery*, 162 Ill. 2d at 103, 642 N.E.2d at 472. Despite section 11, we are not required to follow federal antitrust decisions, although .we may do so if we find them persuasive. *People ex rel. Scott*, 21 Ill. App. 3d at 107, 315 N.E.2d at 132-33.

In civil tort litigation, where there is no direct evidence of a conspiracy and such is provable solely by circumstantial and inferential evidence, courts apply the clear and convincing evidence standard of proof. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134, 720 N.E.2d 242, 258 (1999) (conspiracy to conceal danger of asbestos); *Bosak v. McDonough*, 192 Ill. App. 3d 799, 804, 549 N.E.2d 643, 646 (1989) (conspiracy to defraud); *Tribune Co. v. Thompson*, 342 Ill. 503, 529, 174 N.E. 561, 571-72 (1930) (conspiracy to defraud). The clear and convincing standard is reserved for "exceptional cases," such as where "there is a special need for a greater burden of proof either due to contrary presumptions or the potential unreliability of the evidence in question." *Arrington v. Walter E. Heller International Corp.*, 30 Ill. App. 3d 631, 639-40, 333 N.E.2d 50, 57-58 (1975); see *Greenwald*, 173 Ill. App. 3d at 861, 527 N.E.2d at 1098 (clear and convincing standard is applied where the evidence may be doubtful or capable of reasonable explanation by other theories). Clear and convincing evidence is "the quantum of proof that leaves no reasonable doubt in the mind of

the fact finder as to the truth of the proposition in question," *i.e.*, more than a preponderance while not quite approaching the degree of proof necessary for a criminal conviction. *Bazydlo v. Volant*, 164 Ill. 2d 207, 213, 647 N.E.2d 273, 276 (1995). Where no direct evidence of an agreement or conspiracy exists, circumstantial evidence presented as proof of a conspiracy is susceptible to more than one interpretation because the facts and circumstances relied upon may be " 'as consistent with innocence as with guilt.' " *McClure*, 188 Ill. 2d at 140, 720 N.E.2d at 261, quoting *Tribune Co.*, 342 Ill. at 529. Therefore, the clear and convincing standard is appropriate in such conspiracy cases. *McClure*, 188 Ill. 2d at 140-41, 720 N.E.2d at 261.

Two Illinois courts deciding civil conspiracy cases brought pursuant to the Antitrust Act, *Trowbridge Farm Supply Co. v. W.R. Grace & Co.*, 82 Ill. App. 3d 1140, 403 N.E.2d 311 (1980), and *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 594 N.E.2d 1344 (1992), have followed, without comment, the rule set in the civil tort conspiracy cases that proof of conspiracy must be clear and convincing if made solely by circumstantial evidence. *Trowbridge*, 82 Ill. App. 3d at 1144, 403 N.E.2d at 313-14; *Ray Dancer*, 230 Ill. App. 3d at 50, 594 N.E.2d at 1351. Notwithstanding plaintiffs' assertions to the contrary, we find the clear and convincing standard appropriate in horizontal price-fixing cases such as the one at issue here, where, due to the nature of the market in which defendants operate, the evidence is as susceptible to an interpretation consistent with innocence of a conspiracy as with an interpretation that defendants did tacitly agree to restrain competition.

The Chicago area retail grocery store market is an oligopolistic market, a market dominated by a few firms, here Jewel and Dominick's. In a such a highly concentrated market, one firm's pricing decisions will have a noticeable impact on its rivals and the market. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359. Because the firms are severely impacted by each other's pricing, any decision a firm makes must necessarily take into account the anticipated reaction of the other firm(s) in the market, often resulting in "conscious parallelism" in pricing. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359-60. If a firm is contemplating a price decrease in order to increase sales, unless it can be sure that it can hide the price decrease from its market competitors long enough to gain a substantial advantage before its rivals match that price, the price reduction would merely reduce the firm's profits, and the profits of the other firms as well. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359, quoting P. Areeda and H. Hovenkamp, Antitrust Law § 1429, at 207-08 (2d ed. 2003). Similarly, when a price increase is contemplated, the firm knows that the other

firms may elect to maintain their existing lower price rather than raising theirs to follow the price leader and it will ultimately be forced to reduce its price to match theirs, resulting in loss of sales in the interim. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359, quoting P. Areeda and H. Hovenkamp, Antitrust Law § 1429, at 207-08 (2d ed. 2003). Because each firm is aware of this possibility, if a price increase occurs or is announced, each firm must decide independently whether it is better off matching the higher price or charging the old price. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 359, quoting P. Areeda and H. Hovenkamp, Antitrust Law § 1429, at 207-08 (2d ed. 2003).

■ Despite the apparent noncompetitive nature of such "conscious parallelism," conscious parallelism alone is not violative of the Sherman Act because such interdependent behavior is not an "agreement," as that term is construed under the Sherman Act. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 360. In order to sustain an action based on inferences of conspiracy gleaned from consciously parallel behavior, additional " 'plus factors' " must also exist in order to ensure that courts punish " 'concerted action,' " an actual agreement, rather than the " 'unilateral, independent conduct of competitors.' " *In re Flat Glass Antitrust Litigation*, 385 F.3d at 360, quoting *In re Baby Food Antitrust Litigation*, 166 F.3d 112, 122 (3d Cir. 1999). If plus factors are established, "a rebuttable presumption of conspiracy arises." *In re Baby Food Antitrust Litigation*, 166 F.3d at 122. Three such plus factors would be evidence that (1) the defendant had a motive to enter the price-fixing conspiracy, (2) the defendant acted contrary to its interests and (3) a traditional conspiracy is implied. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 360, quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1244 (3d Cir. 1993). Because the first two factors tend to restate the interdependence involved in parallel pricing, the most important evidence will generally involve the third factor, noneconomic evidence of an " 'actual, manifest agreement not to compete.' " *In re Flat Glass Antitrust Litigation*, 385 F.3d at 360-61, quoting *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 661 (7th Cir. 2002). Besides the usual indications of a conspiracy, such evidence may include " 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.' " *In re Flat Glass Antitrust Litigation*, 385 F.3d at 361, quoting P. Areeda and H. Hovenkamp, Antitrust Law § 1434s, at 243 (2d ed. 2003); *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1244.

In *McClure*, the civil tort conspiracy case extensively cited by the trial court, our supreme court followed federal antitrust cases, as well

as tort conspiracy cases from other jurisdictions, in holding that conscious parallel conduct alone is insufficient proof of the agreement element of the tort of conspiracy. *McClure*, 188 Ill. 2d at 142, 720 N.E.2d at 262. The court noted that federal courts require additional evidence besides conscious parallelism before an agreement violating the Sherman Act can be inferred in order to avoid the inadvertent condemnation of nonconspiratorial conduct. *McClure*, 188 Ill. 2d at 136, 720 N.E.2d at 259, citing *Coleman v. Cannon Oil Co.*, 849 F. Supp. 1458, 1466 (M.D. Ala. 1993). " 'The requirement is intended to help assure that there is a reasonable basis to conclude that persons exchanged assurances of common action or otherwise adopted a common plan, albeit not necessarily through meetings, conversations, or exchanged documents.' " *McClure*, 188 Ill. 2d at 136, 720 N.E.2d at 259, quoting *Coleman*, 849 F. Supp. at 1466. Such additional evidence can include evidence of " '(1) actions contrary to the defendants' economic interests, and (2) a motivation to enter into such an agreement.' " *McClure*, 188 Ill. 2d at 136, 720 N.E.2d at 259, quoting *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1242. Given the ambiguous nature of the evidence in a parallelism case, the court found support for its holding in the clear and convincing standard of proof applicable to conspiracy cases to be proven by circumstantial evidence, noting that under that standard, if the evidence relied upon is as consistent with guilt as with innocence, the court must find that the conspiracy has not been proved. *McClure*, 188 Ill. 2d at 140-41.

In the antitrust case *Trowbridge Farm Supply Co.*, this court adopted the federal rule with respect to the need for additional evidence besides proof of parallel business conduct in order to show a conspiracy agreement or antitrust violation. *Trowbridge Farm Supply Co.*, 82 Ill. App. 3d at 1144-45, 403 N.E.2d at 314. Citing federal law, *Trowbridge* examined the evidence for some indication that the entities who engaged in the parallel behavior "also knew of the conduct of each other" because " '[t]he substantive law of trade conspiracies requires some consciousness of commitment to a common scheme. *** Unless the individuals involved understood from something that was said or done that they were, in fact, committed to raise prices [or to restrain trade], there was no violation of the Sherman Act.' " *Trowbridge*, 82 Ill. App. 3d at 1145, 403 N.E.2d at 314, quoting *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963). As noted previously, *Trowbridge* also adopted, without comment, the clear and convincing standard of proof for an antitrust conspiracy.

Federal courts have applied the preponderance of the evidence standard in civil price-fixing cases brought under section 1 of the Sherman Act. See *In re High Fructose Corn Syrup Antitrust Litigation*, 295

F.3d at 663; *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 788 (7th Cir. 1999). But, where the plaintiff relies on ambiguous, circumstantial evidence of a Sherman Act antitrust conspiracy, " 'antitrust law limits the range of permissible inferences' " to be drawn therefrom. *In re Flat Glass Antitrust Litigation*, 385 F.3d at 357, quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 89 L. Ed. 2d 538, 553, 106 S. Ct. 1348, 1356 (1986). "This higher threshold is imposed in antitrust cases to avoid deterring innocent conduct that reflects enhan ed, rather than restrained, competition." *In re Flat Glass Antitrust L igation*, 385 F.3d at 357. Acceptable inferences which may be drawn from circumstantial evidence " 'vary with the plausibility of the plaintiffs' theory and the dangers associated with such inferences.' " *In re Flat Glass Antitrust Litigation*, 385 F.3d at 357, quoting *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1232, following *Matsushita Electric Industrial Co.*, 475 U.S. at 587, 89 L. Ed. 2d at 553, 106 S. Ct. at 1356. However, even where the plaintiff's theory is plausible, when the allegations concern, as here, horizontal price-fixing among oligopolists, federal courts have been cautious in accepting inferences from circumstantial evidence because of the interdependence among the oligopolists (*In re Flat Glass Antitrust Litigation*, 385 F.3d at 358-59), an analysis more in line with *McClure*'s use of the clear and convincing standard of proof than a preponderance of the evidence standard.

Accordingly, where there is no direct evidence of a price-fixing conspiracy and such is provable solely by circumstantial and inferential evidence, the court should apply the clear and convincing standard of proof and require evidence of conscious parallelism and additional plus factors. Because there was no direct evidence of a conspiracy here and, as they admitted in their pretrial memorandum, plaintiffs would "prove their case with circumstantial evidence," the court did not err in applying the clear and convincing standard of proof in this case.

## Manifest Weight of the Evidence

■ The court's finding that the evidence was insufficient to show the existence of a price-fixing conspiracy was not against the manifest weight of the evidence. Plaintiffs argue that the court erroneously required them to prove "an actual manifest agreement not to compete." Plaintiff is correct that a price-fixing conspiracy can exist even where there is no binding contract or agreement between competitors but rather informal agreements or understandings. "[T]he ultimate facts needed to prove a violation of section 3(1)(a) are agreements among those who would otherwise be competitors for the purpose or with the effect of fixing the price charged for any goods or

service received." *Fahner*, 88 Ill. 2d at 309, 430 N.E.2d at 1009. Therefore, in order to present a *prima facie* case for conspiracy to fix milk prices in violation of section (3)(1)(a), plaintiffs must present some evidence that defendants were competitors, or would otherwise be competitors absent the alleged conspiracy, who agreed or conspired to fix the price of milk, thereby injuring plaintiffs and causing them to suffer damages. However, as the committee comments to section 3(1) make clear, "it is not necessary that there be a binding contract or agreement between competitors. Informal agreements or understanding or loose combinations or conspiracies to accomplish the forbidden purposes [here, price-fixing] would also violate this subsection." 740 ILCS Ann. 10/3(1), Committee Comments—1967, at 15 (West 2002).

Similarly, federal courts interpret Sherman Act language referring to " 'contract,' " " 'combination' " or " 'conspiracy' " as requiring " 'some form of concerted action' " (*In re Flat Glass Antitrust Litigation*, 385 F.3d at 357, quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 & n.1 (3d Cir. 1994)), such that there must exist a unity of purpose, common design and understanding, meeting of minds or a " ' "conscious commitment to a common scheme" ' " (*In re Flat Glass Antitrust Litigation*, 385 F.3d at 357, quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764, 79 L. Ed. 2d 775, 786, 104 S. Ct. 1464, 1471 (1984), quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)). The section 1 statutory language is broad enough "to encompass a purely tacit agreement to fix prices, that is, an agreement made without any actual communication among the parties to the agreement." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d at 654. However, it is generally believed that an express, manifest agreement involving actual, verbalized communication must be proved in order to find an actionable price-fixing conspiracy. *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d at 654.

The court's order shows that it was well aware that no express, manifest agreement was required. Plaintiffs point to the court's statement that plaintiffs had to prove that there was an actual manifest agreement not to compete. Plaintiffs have taken the court's statement entirely out of context. The court made the above statement in the context of its discussion of the *In re High Fructose Corn Syrup Litigation* case. In its entirety, the court's statement reads, "Furthermore, even in the face of non-competitive behavior, that is, parallel pricing of [high fructose corn syrup], the plaintiffs 'must prove . . . there was an actual manifest agreement not to compete.' " The court then cautions the reader to "[r]emember, in the Fructose case there *was* direct evidence of a conspiracy." (Emphasis in original.) The court then

continued its analysis of the evidentiary requirements by stating that the court in *McClure* "further honed the law," clearly showing its recognition that the *Fructose* case was not the final word on the evidentiary requirements.

The court quoted *McClure*, stating that "a conspiracy 'is almost never susceptible to direct proof, but by inference and circumstantial evidence. Absent direct proof, the evidence must be clear and convincing.' " It then stated *McClure*'s holding that mere parallel pricing is insufficient to establish conspiracy and that " 'additional evidence' " called " 'plus factors' " is required and that "[s]uch includes: 1) Actions contrary to the defendants['] economic interests and, 2) a motivation to enter into such agreement." Then, applying *McClure*, the court stated:

> "Applying the law, there is no direct evidence of agreement to fix the price of milk. There is some evidence of parallel pricing, but not on all grades of milk offered for sale. Does the evidence, as required by law, show a concerted act contrary to the defendants [*sic*] economic interests with an illicit motive?"

Clearly, the court understood that a manifest agreement was not required and that, if one was not apparent from direct evidence, the court had to look to evidence of parallel pricing and plus factors to determine whether a concerted act of price fixing occurred. Moreover, as the court in *In re Flat Glass Antitrust Litigation* recognized, in horizontal price-fixing cases occurring, as here, in an oligopolistic market, evidence of the two factors noted by the court, that defendants acted contrary to their own interest and they had a motive to enter a price-fixing conspiracy, tend to involve the same evidence of interdependence as that presented as evidence of parallelism. It is the third plus factor enumerated in *Flat Glass*, evidence that a traditional conspiracy is implied, which then necessarily takes on the most importance. And this third factor involves noneconomic evidence of an actual manifest agreement not to compete, even though an express agreement is not required in order to find either a section 3(1)(a) or a section 1 Sherman Act conspiracy.

There is no question that some parallel pricing existed between defendants' premium milk brands. Therefore, we must consider whether the court erred in finding that there was no clear and convincing evidence of the existence of one or more plus factors. Plaintiffs argue that the court erred in requiring them to prove both (1) that an individual defendant's action would not have been in its self-interest if there was no conspiracy and (2) a strong motivation of defendants to conspire. The court's order states that plus factors required in addition to evidence of parallelism "include[ ]: 1) actions contrary to the

defendants['] economic interests and, 2) a motivation to enter into such agreement." The court is merely restating *McClure*, and although it only cites two factors, the court's use of the word "include[ ]" reflects its recognition that this enumeration is not all-inclusive. Arguably, the court's statement could be read as requiring that both plus factors must be shown in order to sustain a conspiracy case. However, although evidence of a single plus factor can suffice to support an inference of conspiracy, individual plus factors are not examined in a vacuum but rather are examined as a whole. Evidence of a defendant's economic interests will generally be inexorably linked to evidence of its motive to enter into a price-fixing agreement.

Plaintiffs point to the court's statement of the salient issue, "Does the evidence, as required by law, show a concerted act contrary to the defendants [*sic*] economic interests with an illicit motive?" as reflecting the court's misunderstanding of the principles underlying the two plus factors that he cited. Plaintiffs are correct that the law does not "require" that an act contrary to defendants' economic interests be proven. Acting against self-interest is but one of several possible plus factors, none of which is required.

Plaintiffs also point to the court's statement that "[t]he profit motive is, on the contrary, not against the mutual interest of the defendants" as reflecting the court's misunderstanding of the law. Plaintiff is correct that the principle underlying the "against self-interest" plus factor concerns an individual competitor's self-interest rather than the alleged conspirators "mutual" self-interest. Evidence of that plus factor would concern how a competitor would act if it did not have an understanding that its competitor(s) would act the same way.

As stated previously, in a market dominated by only two firms, each competitor necessarily takes into account the actions of the other. One firm will lead and the other will follow. Even if the two roles switch back and forth between the two competitors, they will still always act interdependently. Such interdependent behavior occurs even in the absence of an implicit, tacit understanding, and it serves both competitors' profit-making motives. In such a market, if the competitors then agreed to coordinate their pricing, *i.e.*, formalize in some fashion the way in which they had been doing business independently, neither would be acting against self-interest and each would be spurred by the same profit-making motive, and, under those circumstances, their mutual self-interest. Although the court may be technically incorrect in its statement, realistically, under the facts at issue here, it would appear that either competitor acting independently would act no differently than if it had an understanding with the

other; save perhaps that, with an understanding between them, the profits for both would be even higher.

The existence of plus factors tends to exclude the possibility that defendants engaged in consciously parallel behavior were acting independently. Plaintiffs argue that the court erred in finding they failed to establish either of the enumerated plus factors because they presented the following evidence of plus factors tending to exclude the possibility that defendants' conscious parallelism was independent: (1) defendants high milk prices, their October 1999 retail price increase and their failure to reduce prices after the December 1999 wholesale cost decreases; (2) defendants' reciprocating agreement to price check each other's stores; (3) defendants' simultaneous switch to unitary pricing because it (a) makes adherence to parallel pricing easier and (b) the reasons offered for doing it were pretextual; (4) defendants' extraordinary profit margins on milk sales; (5) defendants' stable market shares; (6) defendants' strong motive to fix milk prices; (7) expert testimony; and (8) defendants' postcomplaint conduct. We do not find that the court's determination that the evidence shows competition rather than a price-fixing conspiracy is against the manifest weight of the evidence.

In order to create a rebuttable presumption of a conspiracy, plaintiffs had to clearly and convincingly show the trial court that defendants " 'understood from something that was said or done that they were, in fact, committed to raise prices [or to restrain trade].' " *Trowbridge*, 82 Ill. App. 3d at 1145, 403 N.E.2d at 314, quoting *Standard Oil Co.*, 316 F.2d at 890. Here, however, given the two-firm oligopoly market in which defendants operate, plaintiffs' plus factor evidence is as susceptible to an interpretation of " 'unilateral, independent conduct of competitors' " (*In re Flat Glass Antitrust Litigation*, 385 F.3d at 360, quoting *In re Baby Food Antitrust Litigation*, 166 F.3d at 122) as it is of a concerted action, express or tacit, to illegally restrain the price of milk. There is no question that defendants' milk prices did not reflect the actual cost of the various types of milk or any decreases in the cost. But, as the court stated, it is not illegal to want to make a profit. If the market will bear two high-priced milk purveyors, why would one competitor attempt to undercut the other's prices only in order to sell greater quantities of milk at the lower price in order to make the same or smaller profit margin. Moreover, even if the lower price strategy is successful in driving sales and profits or perhaps in changing consumers' allegiance from one competitor to the other, the follower would just follow suit and reduce its price accordingly as soon as it realized what had happened and negate any advantage. This is illustrated by defendants'

conduct in April 1999, when Jewel dropped the shelf price of its milk by 50 cents per gallon and Dominick's matched the decrease three days later because, as its' president explained, Dominick's "can't give them the edge like that." It is in each competitor's best interest to maintain a high price of milk, and in a market as we have here, this could occur naturally and need not be the result of a collusive understanding to violate the Antitrust Act. Indeed, the evidence showed that defendants' identical decision not to reduce their milk prices when the national wholesale cost of milk dropped by 40 cents in December 1999 was not just common to other retailers across the country but, in the Chicagoland area, was matched to the penny by Cub Foods and Eagle Food Centers.

Similarly, defendants' stable market shares and profit margins as well as their cooperation in price checking each other's stores and their use of the same pricing system are as susceptible to an "interdependent" explanation as they are to an anticompetitive one. Defendants admitted that Jewel was the price leader and that Dominick's always followed Jewel's price lead in markets wherein each was the other's main competitor. Both made conscious business decisions on the basis of this knowledge but that does not mean that both "agreed" or "understood" that the reason behind the "follow the leader" pricing was to illicitly fix prices. Although that is a possible inference, it is not so strong that it outweighs the inference that defendants were acting competitively in an oligopolistic market. This is especially true since, notwithstanding Dominick's following Jewel's lead on the base price for premium milk, it regularly undercut that base price through $1 off promotions, thus driving traffic into its stores on those promotional days. If it maintained a lower base price to start with, the promotions could not be as dramatic without sacrificing profits which could not be outweighed by greater sales volume. Why should either defendant be expected to experiment with pricing, as plaintiffs suggest, when each testified that the current pricing system works adequately for its purposes and is implemented according to each firm's business strategy? Why risk losing a sure profit just to make a short-term gain that your competitor will negate by adjusting its own price in short order? As plaintiff's expert Dr. Rogers testified, any competitive advantage gained by either competitor through undercutting its opponent's price soon would be eliminated when the opponent reduced its price to match.

Any informal price-checking arrangements between defendants obviously facilitated parallel pricing and one could reasonably infer that such existed in aid of a tacit agreement to raise and maintain prices. Plaintiffs' expert, Professor Kamien, testified that such systems

are not consistent with competition and are an integral part of a price-fixing conspiracy. Posted prices are public information and defendants could not prevent price checking. An open-door policy with regard to price checking by a competitor does not show the existence of an agreement.

Similarly, although defendants' use of unitary pricing across the types of milk would make coordinating prices with each other and adhering to parallelism much easier, it could also serve competitive purposes. By pricing milk the same within a product line, no matter the type of milk, consumers have an easier time comparing prices and the competitor can more easily administer its milk programs, having to generate promotions and sales for only a single "brand" rather than for four different types of product within a brand. Further, by cuing the unitary price to the cost of whole milk, the most expensive type, as defendants do here, a competitor would generate higher profits than if it cued the price to an average cost of the four milk types.

Dominick's asserted that it switched to unitary pricing because (1) consumers could now choose from among four types of milk at the same price point rather than having to limit their selection to the lowest priced milk, which would always be skim milk if milk prices were cued to the wholesale cost of each milk type; (2) administering cost changes would be easier if all milk was priced the same; and (3) it would be easier to administer promotions. Plaintiffs may assert that Dominick's reasons for unitary pricing were "pretextual," but that is for the trial court to decide based on the credibility of witnesses and their demeanor. The fact that the unitary milk price was based on the cost of the highest priced milk rather than the lowest makes profit-maximizing sense.

Plaintiffs' three experts testified variously that, based on defendants' parallel pricing, cooperative price checking and similar promotional strategies, comparative statistical analyses of milk prices and profit margins, the type of market, fungible product and stable market shares, defendants' conduct was consistent with a collusive agreement not to compete on milk prices. The trial court was not swayed by the experts' opinions that defendants were acting in collusion and this determination was not against the manifest weight of the evidence given the testimony elicited on cross-examination. That testimony disclosed that two of the experts did not consider defendants' milk promotions, i.e., the price actually paid for milk regardless of the listed shelf price, in reaching their conclusions, even though one of them, Dr. Rogers, stated that such evidence was relevant to the question of price competition. The experts also acknowledged that "follow the leader" pricing is common in the type of oligopolistic market

defendants share, as are high prices and high profits, even in the absence of a conspiracy.

Pursuant to defendants' motion *in limine*, the court excluded evidence regarding defendants' milk prices occurring after the date the complaint was filed on August 23, 2000. Plaintiffs wanted to present evidence that (1) on August 31, 2000, eight days after plaintiffs filed their complaint, Jewel reduced its premium milk price from the price at which it had been set for nine months by 40 cents per gallon, allegedly reflecting the wholesale price drop that had occurred in December 1999, and that Dominick's followed suit shortly thereafter; and (2) Dominick's had advance notice of a Jewel price change as shown by an "urgent" e-mail to Dominick's store managers on the day of the price change telling them to check Jewel's gallon milk prices and respond by the end of the day, rather than the following week as usual. Admissibility of evidence lies within the trial court's discretion. Evidence of conspiracy occurring before or after a plaintiff's damage period may be relevant to proving a conspiracy existed during the period. Here, however, where the evidence is merely cumulative of the other parallel-pricing evidence presented, the court did not abuse its discretion in excluding it. Both the price drop and the e-mail message merely show that Dominick's consistently followed Jewel's pricing lead. Moreover, it is hard to argue that the e-mail would have served as evidence of advance notice, presumably by Jewel, to Dominick's when the e-mail was disseminated the same day as Jewel's price decrease and any consumer calling Dominick's to complain about its higher price would have served as notice of the price change, thus alerting Dominick's that it should investigate further. The evidence was properly excluded.

In order to allow defendants' section 2—1110 motion, the court had to find plaintiffs' evidence "so convincing and unequivocal as to enable it to draw inferences and reach the conclusions necessary to a finding that the antitrust statutes were violated." *People ex rel. Scott*, 21 Ill. App. 3d at 110, 315 N.E.2d at 135. Plaintiffs' evidence of parallel pricing and plus factors was as susceptible to an innocent, market-based, competitive explanation as to an anticompetitive one. Given the absence of clear and convincing plus factors tending to show that defendants' parallel behavior was pursuant to some agreement, tacit or otherwise, to illegally restrain the price of milk, the evidence here was not so convincing and unequivocal that the court could find a violation of section 3(1)(a) of the Antitrust Act. The court's decision was not against the manifest weight of the evidence. The court did not err in granting defendants' section 2—1110 motion.

For the reasons stated above, we affirm the decision of the trial court.

Affirmed.

HARTMAN and HOFFMAN, JJ., concur.